UNITED STATES v. UNITED SHOE MACHINERY CO. et al.

(District Court, E. D. Missouri, E. D. November 9, 1915.)

No. 4489.

1. MONOPOLIES ⊂═12—CLAYTON ANTI-TRUST ACT—MONOPOLISTIC LEASES.

Leases, by the maker of a very large percentage of all the shoe machinery made in the United States, of machines to shoe manufacturers, consisting of principal and auxiliary machines, the use of both kinds being necessary in the completion of a shoe, which leases contain provisions that the lessee shall not use the machine in the manufacture of footwear which has not had certain essential operations performed upon it by other machines leased from the lessor, that he shall use the leased machine exclusively for the class of work for which it is designed, that he shall obtain all duplicate parts and all supplies for the machine exclusively from the lessor at such prices as it may establish, and other similar provisions, and which further give the lessor the right to remove all leased machines in the event of the violation by the lessee of any term of any one of the leases, *held*, on motion for preliminary injunction, illegal, as in violation of Clayton Act, Oct. 15, 1914, c. 323, § 3, 38 Stat. 731.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ⊂═12.]

2. MONOPOLIES ⊂═10—CLAYTON ANTI-TRUST ACT -CONSTRUCTION—APPLICATION TO EXISTING CONTRACTS.

Clayton Anti-Trust Act, § 3, which makes it unlawful to lease or sell machinery, etc., on any condition or agreement which will tend to prevent the lessee or purchaser from dealing with competitors of the lessor or seller, is applicable to a continuing contract of lease, although made before its passage.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 9; Dec. Dig. ⊂═10.]

In Equity. Suit by the United States against the United Shoe Machinery Company and others. On application for preliminary injunction. Granted.

Arthur L. Oliver, U. S. Atty., of St. Louis, Mo., C. J. Smyth and H. La Rue Brown, Sp. Assts. Atty. Gen., for the United States.

C. A. Severance, of St. Paul, Minn., and Chester H. Krum, of St. Louis, Mo. (Douglas Robert, of St. Louis, Mo., and Fish, Richardson, Herrick & Neave, of Boston, Mass., on the brief), for defendants.

DYER, District Judge. The plaintiff filed its bill of complaint against the defendants, and therein prays, among other things, that a preliminary injunction be granted restraining the defendants and each of them from directly or indirectly enforcing, threatening, or attempting to enforce certain clauses of the leases particularly referred to

in the bill. Upon the hearing of this application the court was favored by long and able arguments, to which it listened with attention and interest. The court was further favored by written arguments and briefs, to which it has also given consideration.

I recognize to the fullest extent, and heartily approve, the principles expressed in the opinion of the Supreme Court of the United States in Truly v. Wanzer, 5 How. 141, 12 L. Ed. 88, to wit:

"There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction."

In the light of that announcement, let us see what is now before the court.

[1] By an act of Congress approved October 15, 1914, commonly called or known as the "Clayton Act," it was provided, among other things, as follows:

"Sec. 3. That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any territory thereof, or the District of Columbia, or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

The bill in this case states: That nearly all of the shoes made in the United States are manufactured by machinery, 98 per cent. of which machinery is made and controlled by these defendants. That over 1,500 manufacturers of shoes by machinery are engaged in business throughout the United States, and make and put out annually 300,000,-000 pairs of machine made shoes, and that with all but a few of the manufacturers the defendants have business relations. The defendants, it is averred, devote themselves particularly to the production of machinery used in preparing and attaching the soles to the uppers of shoes, but they do not manufacture machinery used in stitching together the uppers. Some of the machines made by the defendants are designated by them as "principal," while others are designated "auxiliary." The bill avers that important machines are put out by the defendants upon leases. On some of the machines the lessee is required to pay a royalty; on others, an annual rental. The "principal" machines cannot be operated profitably without the use of some, if not all, of the "auxiliary" machines, and the latter are of no practical value, except as they are used in connection with the "principal" machines. The bill further avers that the writings under which the defendants put out most of their machinery are designated "Order and Temporary Loan Agreement," "Lease and License Agreement," or "Agreement"; but each and all of them are referred to as leases. These leases run for a period of 17 years, and some of them were

made before and some after the passage of the act of October 15, 1914, commonly called the Clayton Act.

No complaint is made of the leases as a whole. Complaint is made only as to certain clauses therein. No relief is sought against the lessees. The clauses complained against are called in the bill "tying clauses." These clauses are Exhibits 1, 2, 3, 4, 5, 6, 7, and 8, and are as follows:

"(1) Shall not use the machine in the manufacture or preparation of foot-wear *which has not had certain essential operations performed upon it by other machines leased from the lessor.*

"(2) Shall use the leased machine to its fullest capacity.

"(3) Shall use *exclusively* the leased machine for the class of work for which it is designed.

"(4) Shall obtain from the lessor *exclusively*, at such price as it may establish, all duplicate parts and mechanisms needed in operating the leased machines and *all supplies* in connection with them.

"(5) Shall use patented insoles made on *defendants' machinery only* in connection with certain footwear manufactured by machinery leased from the lessor.

"(6) Shall lease from the lessor any additional machinery which he may need for work in the same department as that of the machine leased.

"(7) Shall permit the *lessor* to *determine* whether the lessee has in his factory more machinery adapted for doing the same work than he needs, and, if so, *to remove such machines as, in the opinion of the lessor,* are unnecessary.

"(8) Shall, at the *election of the lessor,* suffer a termination of all leases which he may have and the removal of all machines leased by him from the defendants, in the event of the violation of any term of any one of the leases."

The question then is: Are the clauses inserted in and forming parts of the contracts between the defendants and their lessees prohibited by the act of Congress heretofore referred to. Reading this act of Congress and the clauses complained of together, there can be but one conclusion, and that is that all of the clauses (with the possible exception of No. 2) complained of in the bill are clearly violative of the plain words of the statute.

If the court were in doubt as to the meaning of the act and of the intention of Congress in enacting it, that doubt would be readily removed by reading and considering the proceedings in both houses of Congress touching the purpose of the law. In reference to section 3 of that act, the judiciary committee of the House made a report in which appears the following:

"Where the concern making these contracts is already great and powerful, such as the United Shoe Machinery Company, the American Tobacco Company, and the General Film Company, the exclusive or 'tying' contract made with local dealers becomes one of the greatest agencies and instrumentalities of monopoly ever devised by the brain of man. It completely shuts out competitors, not only from trade in which they are engaged already, but from the opportunities to build up trade in any community where these great and powerful conditions are appearing under this system and practice. By this method and practice the Shoe Machinery Company has built up a monopoly that owns and controls the entire machinery now used by all great shoe manufacturing houses of the United States. No independent manufacturer of shoe machines has the slightest opportunity to build up any considerable trade in this country while this condition obtains. If the manufacturer, who is using machines of the Shoe Machinery Company, were to purchase and place a machine manufactured by an independent company in his establishment, the Shoe Machinery Company could, under its contracts, withdraw all of its machinery

from the establishment of the shoe manufacturer and thereby wreck the busi-ness of the manufacturer. * * * Again: If the transaction results in com-pletely driving out competitive articles from the community, as the con-tract by its terms takes them out of the business of the local dealer, there can be little room to question the contention of the advocates of this system that both the manufacturer and the dealer are benefited by the transaction. If, on the contrary, the local merchant who has tied his hands by an exclusive con-tract cannot drive out of the community competitive articles, and thereby se-cure a monopoly of the trade in his immediate locality, it is manifest that he has been seriously hampered and injured in his business by the restrictions placed upon him by his contract. Again: What is the motive and purpose of the manufacturer in making or entering into such exclusive contracts? It is undoubtedly his purpose to drive out competition and to establish a mo-nopoly in the sale of the commodities in that particular community or locality. His contract by its express terms completely shuts out competition in the busi-ness of the local dealer with whom he makes it. The dealer bound by this exclusive contract not to handle the goods, wares, and merchandise of an-other becomes an ally of the manufacturer in his efforts and purpose to drive out competition in the locality or community in which such commodities are sold."

There can be no question but that the act of Congress was aimed directly at the defendant the Shoe Machinery Company.

[2] It is insisted by counsel for defendants that the act can only apply to leases made after the act took effect. A satisfactory answer to this contention, I think, is made by the District Court of the United States for the Western District of Michigan in the case of Elliott Ma-chine Co. v. Albert M. Center, 227 Fed. 124. In that case the court said:

"However, the principal question argued at the hearing of this motion to dismiss was that of the application and effect of the Clayton Act to and upon the contract between these parties which was made and entered into prior to the congressional enactment. In this discussion of the question counsel for both parties have assumed that the contract is single, and also that it is one which, if made at the present time, would fall within the ban of section 3 of the act. Counsel for defendant earnestly insist that, even if Congress so intended, the statute cannot be construed to apply to pre-existing contracts, and to prohibit their performance and enforcement, without violating funda-mental and constitutional rights. The statute does not in terms except from its operation any agreements or contracts, past, present, or future, and in the absence of such exception it is to be presumed that Congress intended to pro-hibit, not only the making of future contracts, but also the further perform-ance of past contracts of the kind specified. Congress derives its power to enact such legislation from the commerce clause of the Constitution, and the power so conferred is broad, comprehensive, and all-embracing. All persons entering into contracts involving interstate commerce must do so subject to the right of Congress thereafter to control, regulate, and prohibit the performance thereof. 'Every owner of property holds the same subject to such action as the sovereign power of the state may, in the exercise of its legitimate sov-ereignty, adopt in relation to it.' It is now too well settled to admit of con-troversy that a contract to do a thing, lawful when made, may be avoided by subsequent legislation making it unlawful, and that an act of Congress may lawfully affect the rights which had their inception before its passage."

Counsel here contend that, if an injunction as prayed for in the bill be granted, irreparable damage will be done, not only to the de-fendants, but to each and every one of the hundreds of those manu-facturers in the United States who are lessees of the defendants. Even if this be true, the court should not hesitate to declare the law,

whatever the result to the defendants and their lessees may be. If the course adopted and practiced by the defendants has had the effect to stifle competition and create a monopoly, then the law should be enforced, even if it resulted in going back to the awl and wooden peg. The continuing of the business as heretofore practiced by the defendants and its lessees might and probably would further enrich them, but this would be done at the expense of the men, women, and children who, by reason of the monopoly, are forced to buy shoes from such lessees and manufacturers. The high prices paid by manufacturers for the use of defendants' machines, "principal" and "auxiliary," fall eventually upon those who wear the shoes. It is in the interest of and for the benefit of those that the law was enacted. It is hard to see how the ingenuity of man could have devised a scheme that would more effectually create a monopoly than the scheme set forth in the bill in this case.

After fully considering the verified bill, and the affidavits filed in support thereof, as well as the affidavits presented and filed by the defendants in opposition, the court has reached the conclusion that the temporary injunction prayed for in the bill should be granted; and it is so ordered.