## UNITED STATES v. UNITED SHOE MACHINERY CO. et al.

(District Court, E. D. Missouri. March 31, 1920.)

No. 4489.

1. Constitutional law ⬩⬩⬩295—Clayton Act held not invalid, as depriving patentee of vested rights.

Clayton Act, § 3 (Comp. St. § 8835c), prohibiting leases or sales in interstate commerce on the condition that the lessee or purchaser shall not use or deal in the goods of competitors, where the effect of such lease or sale or condition may be to substantially lessen competition or tend to create a monopoly, is not, as applied to provisions in leases of patented

⬩⬩⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

machines, unconstitutional, as depriving the patentee of rights, in violation of the Fifth Amendment to the Constitution, though such provisions were recognized as valid prior to its enactment.

**2. Patents ☞191—Only effect is to restrain others.**

While patents are property, the only effect of a patent is to restrain others from manufacturing, using, or selling that which the patentee has invented.

**3. Patents ☞220—Contracts concerning patented articles subject to governmental control.**

There is nothing in the laws relating to patents which affects contracts for license, use, sale, or lease of patented articles, and they are subject to the same governmental and legislative control as other contracts.

**4. Commerce ☞12—Patents ☞220—Congress has power akin to police power.**

Though the Tenth Amendment to the Constitution reserves the police power to the states, Congress, in exercising its exclusive power to regulate interstate commerce and to grant patents, possesses the right, akin to the police power of the state, to regulate acts relating to patents, especially when employed in interstate or foreign commerce.

**5. Commerce ☞3—Patents ☞220—Vested right to lease patented articles with restrictions may be regulated.**

Assuming that decisions recognizing the right of patentees to lease patented machines, subject to restrictions on their use in connection with machines of competitors, constituted a vested right in the patentee, such right was still subject to regulation by Congress, under the commerce and patent clauses of the Constitution.

**6. Constitutional law ☞92—No vested right in common law or judicial decisions.**

No person has a vested right in the common law or in judicial decisions, except as they become res judicata between the parties and their privies, entitling him to insist that they shall remain unchanged for his benefit.

**7. Constitutional law ☞92, 121(1)—No vested right in statute addressed to no particular person; creates no "contract."**

A statute addressed to no particular person does not constitute a "contract," and creates no vested right, and may be repealed at any time.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contract.]

**8. Constitutional law ☞120—Contracts may be nullified, if injurious to public.**

There is nothing in the federal Constitution prohibiting Congress or a state from nullifying existing contracts, if in the opinion of the legislative department, based on substantial grounds, they are injurious to the public.

**9. Constitutional law ☞70(3)—Courts may review reasonableness of regulation, but not wisdom of act.**

The review by the courts of legislative acts regulating contracts is limited to the question whether there is any reasonably substantial ground for the regulation, and the wisdom of the act cannot be questioned by the courts.

**10. Judgment ☞585(5)—Decree in suit to dissolve as monopoly not conclusive in suit under the Clayton Act.**

A decree for defendants, in a suit under the Sherman Act (Comp. St. §§ 8820–8823, 8827–8830) to dissolve them on the ground that they constituted a monopoly in restraint of trade and commerce, and were attempting to monopolize and had monopolized trade and commerce, in which provisions of leases of shoe-making machinery were set out solely to maintain the charge that by their use, in connection with other acts, defendants had conspired in restraint of trade, was not res judicata in a suit under Clayton Act, § 3 (Comp. St. § 8835c), subsequently enacted, to enjoin the use and enforcement of leases containing such provisions.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**11. Commerce ⊚⟶16—Parties leasing machines to manufacturers held engaged in interstate commerce.**

Where one of the defendants was engaged in leasing shoe-making machinery to manufacturers in various states on orders obtained by its local representative and sent to its home office in Massachusetts, and the machines were shipped from Massachusetts, consigned by defendant to itself, and set up and installed in the lessees' factories by its agents, it was engaged in interstate commerce with respect to machines shipped to points outside Massachusetts, though the leases were not executed until after the machines were set up.

**12. Commerce ⊚⟶16—Lessors of machines not engaged in interstate commerce as to part of business.**

Where defendant, engaged in leasing shoe-making machinery in interstate commerce, would occasionally deliver a machine refused by a lessee to another manufacturer in the same state, it was not engaged in interstate commerce with respect to such removal of machines and their delivery to the other manufacturer.

**13. Monopolies ⊚⟶12(1)—Monopolistic tendency of leases of machines held violative of Clayton Act.**

Where provisions of leases of shoe-making machine in interstate commerce, restricting their use in connection with machines of competitors, put it in the power of the lessor, or have the effect or tend to substantially lessen competition, or establish a monopoly, they are illegal under Clayton Act, § 3 (Comp. St. § 8835c), though the lessor has not succeeded in unduly monopolizing or attempted to monopolize unduly any part of interstate commerce, as would be necessary under the Sherman Act (Comp. St. §§ 8820–8823, 8827–8830).

**14. Monopolies ⊚⟶12(1)—Monopolistic tendency of leases of machinery violative of Clayton Act held not removed by option for unrestricted leases.**

The illegality, under Clayton Act, § 3 (Comp. St. § 8835c) of provisions of leases of shoe-making machine in interstate commerce, restricting their use in connection with machines of competitors, was not obviated by giving lessees an option of taking unrestricted leases, where the terms of such unrestricted leases were practically prohibitive.

**15. Monopolies ⊚⟶12(1)—Discounts and lower rates under leases held not "wholesale rates," permissible by Clayton Act.**

Lower rates offered by a lessor of shoe-making machinery to manufacturers leasing all machines used by them from the lessor, and discounts allowed them, *held* not permissible as "wholesale rates," within Clayton Act, § 2 (Comp. St. § 8835b), assuming that such section applies to leases claimed to violate section 3 (section 8835c).

**16. Monopolies ⊚⟶12(1)—Clayton Act does not permit discriminations in prices under leases.**

Clayton Act, § 2 (Comp. St. § 8835b), which, in forbidding discriminations in prices, provides that this shall not prevent discrimination between purchasers on account of differences in the quantity sold, is limited to sales, and does not apply to leases which may substantially lessen competition or tend to create a monopoly, in violation of section 3 (section 8835c).

**17. Monopolies ⊚⟶12(1) — Monopolistic leases held violative of Clayton Act, though lessor never enforced forfeiture.**

In a suit under Clayton Act, § 3 (Comp. St. § 8835c), to enjoin the enforcement and use of leases of shoe-making machinery containing provisions restricting their use in connection with the machines of competitors, and providing for forfeiture for violations of such restrictions, it was not a defense that no leases had been forfeited for violations, where lessees had been penalized and their attention called to such provisions.

---

⊚⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**18. Monopolies ⬤⟿24(1)—Monopolistic clauses in temporary leases ground for injunctive relief.**

Though leases of shoe-making machinery in interstate commerce, made since the enactment of the Clayton Act, do not contain the provisions of earlier leases alleged as violations of that act, where they are intended for temporary use, and provide that the lessor may present a new lease at any time, the court will restrain the demanding of new leases containing clauses found to be unlawful.

**19. Monopolies ⬤⟿12(2)—Clause in monopolistic leases, requiring use of machinery to full capacity, held lawful.**

Provisions of leases of shoe-making machinery, requiring the lessee to use the leased machinery to its full capacity, and permitting the lessor to remove machines, if in its opinion the lessee has more machinery than is needed, are not in violation of Clayton Act, § 3 (Comp. St. § 8835c).

**20. Monopolies ⬤⟿12(2)—Clause in monopolistic leases, restricting repairs of machinery, held lawful.**

A provision of leases of shoe-making machinery, requiring lessees to obtain from the lessor exclusively at its regular prices all duplicate parts, mechanisms, or repairs, does not violate Clayton Act, § 3 (Comp. St. § 8835c), where all parts of the machines are very delicate, and unless perfectly adjusted will seriously prevent proper operation of the machine, depriving the lessee of full use and the lessor of royalties.

**21. Monopolies ⬤⟿12(2)—Clause in monopolistic leases of machinery, restricting purchase of supplies, held unlawful.**

A provision of leases of patented shoe-making machinery, requiring the lessee to purchase from the lessor exclusively at prices established by it all supplies used in connection with the leased machinery, violates Clayton Act, § 3 (Comp. St. § 8835c), as tending to substantially lessen competition and create a monopoly, though the prices charged by the lessor for such supplies are reasonable and have not been advanced in years.

**22. Monopolies ⬤⟿12(2)—Clause in monopolistic leases of machinery, as to duration, held lawful.**

A provision of leases of patented shoe-making machinery, providing for the continuance of the lease for 17 years from its date, unless sooner terminated by the lessor, is not unlawful, under Clayton Act, § 3 (Comp. St. § 8835c), or otherwise.

**23. Monopolies ⬤⟿12(2)—Clause of monopolistic leases, authorizing termination for breach of lawful conditions, held lawful.**

A provision of leases of patented shoe-making machinery, authorizing the lessor to terminate the lease for the breach of any of the conditions of any of the leases, is not unlawful, so far as it authorizes termination for the breach of lawful conditions.

**24. Monopolies ⬤⟿12(2)—Clause in monopolistic leases of machinery, as to royalties, held unlawful in part.**

Provisions of leases of patented shoe-making machinery, relating to the amount of royalties, *held* unobjectionable in part, but in part violative of Clayton Act, § 3 (Comp. St. § 8835c), as allowing a discount from or rebate on prices, on the condition that the lessee should not use the machinery of competitors.

**25. Monopolies ⬤⟿12(2)—Clauses in monopolistic leases of machinery, as to use of other machinery, held unlawful.**

Provisions of leases of patented shoe-making machinery, prohibiting the lessee from using such machines in connection with machines of competitors, or on footwear partly manufactured on machines of competitors, were in violation of Clayton Act, § 3 (Comp. St. § 8835c).

**26. Constitutional law ⬤⟿186—Retrospective statute may be enacted.**

Congress may enact a statute having a retrospective effect.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**27. Statutes ⊙═263 — Will not be construed as retrospective, unless intention clear.**

A statute will not be construed as retroactive or retrospective, unless the language clearly shows that this was the intention of the lawmakers, and that no other construction will make the act effective, even though the act is remedial.

**28. Monopolies ⊙═10—Clayton Act not retrospective.**

Clayton Act, § 3 (Comp. St. § 8835c), providing that it shall be unlawful to lease or make a sale, or contract for sale, or to fix a price, or discount, or rebate on such price, on the conditions, agreements, or understandings therein mentioned, is not retrospective, and does not apply to provisions of leases existing at the time of its enactment.

**29. Statutes ⊙═217—Rejection of proposed amendment may be considered in construing act.**

The rejection of a proposed amendment to a bill will be considered by the courts in construing the act as finally passed, if its language is doubtful.

**30. Courts ⊙═89—Court must exercise judgment, where there is no authoritative decision.**

In the absence of a decision by a court whose judgment is authoritative on a court trying a case, every judge must exercise his best judgment on legal questions submitted to him in accordance with his own views, though other courts have reached a contrary conclusion.

In Equity. Suit by the United States against the United Shoe Machinery Company and others. Decree for plaintiff in conformity with the opinion.

See, also, 227 Fed. 507; 234 Fed. 127.

The allegations in the complaint, as well as the clauses in the leases claimed to be in violation of section 3 of the Clayton Act (38 Stat. 731, c. 323 [section 8835c, U. S. Comp. St. 1918]), are set out in the former opinion of this court (234 Fed. 127) on the motion of the defendants to dismiss the complaint. It is therefore unnecessary to again state them in this opinion.

The answers of the defendants allege that each of the defendant corporations is an ordinary business corporation, and has a separate and complete entity of its own, although the directors of the United Shoe Machinery Company of Maine and that of New Jersey are for the most part the same. It is admitted that the United Shoe Machinery Corporation owns a large percentage of the stock of the New Jersey company, which latter company, it is not denied, as charged in the complaint, owns all the stock of the Maine company.

The answers further allege that all the machinery the defendants lease to shoe manufacturers are patented, the patents for which were issued prior to October 15, 1914, the date of the enactment of the Clayton Act, and are still in force. They deny that the leases are made in the course of interstate commerce, or that patented articles leased or sold by it are articles of trade or commerce among the several states, within the meaning of the Clayton Act. The machines are manufactured by the New Jersey company, from whom the Maine company obtains them, and leases them to shoe manufacturers in various states of the United States.

They deny that they have business relations with all but a few shoe manufacturers, and that the Maine company markets patented machinery of a special kind manufactured by the New Jersey company, and admit that their business relates mostly to machines adapted for use in the manufacture of the kind of shoes known as "Goodyear welts" and "Goodyear turns."

They deny that the distinction between principal and auxiliary machines, as set forth in subdivision B of section 3 of the complaint is arbitrary, and results from the defendants' system of leasing; but it is claimed to be due to the performance of the principal machines of certain fundamental opera-

⊙═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tions, for which they were designed early in the art of shoe making, while the auxiliary machines prepare the shoe for the operation of the principal machines. They admit that certain of the principal machines are leased upon a royalty basis, while auxiliary machines, it is alleged, are for the most part leased for a nominal rental, and are usually restricted to use with the principal machines, and to the kind of shoes for which they were designed, so that they may be used together as a team or plant, and indirectly earn rentals through the royalties paid for the principal machines.

Under these conditions, and in certain cases, machines of different departments are leased, with a provision that they should be used only in the manufacture of shoes upon which certain other operations have been performed by machines held under lease from the defendants at reduced or wholesale rates, in order that, by economy in free repair and maintenance, co-ordination of operation, a higher quality of product, and increased production of shoes, they may constitute a team or plant and yield better returns, both to the manufacturer and the defendants. These methods are greatly to the benefit of the manufacturers, and not unlawful, and do not tend to have, nor do they in fact have, the effect of substantially lessening competition, nor in fact tend to a monopoly, but in practically all cases machines of different departments are furnished on reasonable terms, without restrictions as to use with machines of other departments, to persons so desiring.

They further allege that the auxiliary machines were developed by the New Jersey company at great expense for the purpose of increasing and developing the manufacture of Goodyear welt and Goodyear turn shoes, by reducing the cost of manufacture, and thereby increasing the use of Goodyear welt sewing and outsole stitching machines. As these auxiliary machines are from time to time improved, they are and always have been furnished to the lessees without any additional charge. They deny that they have shipped to their lessees any machinery or supplies in the course of interstate commerce, and deny the allegations in the complaint that competitors produce machines similar in function to its machines.

It is also alleged that, aside from the protection for their patents, any one may fairly engage in the manufacture and selling or leasing of machines for the manufacture of shoes; that their machines are extensively used, because they are the best of the kind, are patented, and the defendants are the only lessors of shoe machinery, who furnish hourly and daily service for their machines, and because of the excellence of their service furnished without charge. They deny that they have removed machines and imposed heavy penalties upon lessees, as charged in the complaint, nor have they threatened to do so. They admit that they have in a few cases, where the leases and licenses were clearly violated, called the attention of such manufacturer to such violation.

They have other forms of leases, which are without these restrictions, and the shoe manufacturers may exercise their choice which leases they prefer. While their stitch indenters and burnishers are patented, others can be obtained from competitors, and these machines only perform minor operations, and are neither essential nor indispensable in the manufacture of shoes. They deny that the initial premium on their unrestricted or independent leases are prohibitive, and therefore compel the acceptance of restricted leases. They allege that they put out two types of leases, an unrestricted form, involving as a prerequisite the payment of a reasonable initial premium; but it is denied that that initial premium is prohibitive. These unrestricted leases permit the leased machines to be used with machines of other makers. The other leases restrict the use of their machines in certain parts or clauses complained of. The restricted leases grant limited rights to use the machines under leases obtained or granted prior to October 15, 1914. The service furnished by the defendants to their lessees, in order to maintain the efficiency of the machines, costs them over $1,000,000 annually; and they have undertaken, not only to train operators of shoe manufacturers in the proper use of machines, and to secure the prompt repair of machines disabled, but also to supply them with the latest improvements, by substituting improved machines, whenever such are made by them, without extra cost to the user. This service is furnished, by maintaining at 27 central points more than 700

competent employés to attend to them without charge. The limited use clauses in leases tend merely to the leasing of machines in groups, as these machines have a definite mechanical relation to each other and are so designed as to fit each operation, and they are essential for the success of the operation of each machine; for, if such prior operations have not been properly and definitely performed, the work of that machine cannot be done right, and the output is greatly lessened, thereby reducing their rentals.

The requirement in Exhibit 4 to the complaint, that the lessee purchase all duplicate parts and all supplies, used in connection with the leased machines, is reasonable and just, for the reason that, if a part does not properly fit, it would seriously injure the machine, and its income from the other machines leased by them would be seriously affected.

It is also claimed that, as to leases made before the enactment of the Clayton Act, that act would be unconstitutional, if intended to affect them, as claimed by the plaintiff, as it would deprive them of vested rights, in violation of the patent clause of article 1 (clause 8, § 8) and article 5 of the Amendments to the Constitution; the defendant having, prior to the enactment of that act, invested several million dollars in the invention and construction of these machines, covered by patents.

They deny that these leases were put in interstate commerce, as they do not provide for the transportation of machines from one state to another, although some of the machines held under leases were shipped from Massachusetts to other states; that, while the restricted leases require no initial payments as do the unrestricted leases, a charge is made when the machines are returned.

The answers state in detail the history of how the defendant companies were formed, and that the purchases of patents and plan.s from other manufacturers were the logical business result to maintain the position of preeminence in their respective lines; that one of the objects of the restricted leases was to lease them on the wholesale plan, the machines having been designed and adapted to permit successful operations on certain types of shoes and insure greater productivity, better product, less cost of maintenance, and a steadier income to both lessor and lessee; that the defendants make 175 machines for use in the manufacture of shoes, and the restricted leases apply only to a comparatively small number of them; that the royalties charged have never been increased since the leases were first adopted, and in some instances they have been reduced; that machines performing substantially all the operations for which defendants supply machines are manufactured and supplied by other makers, and that the large share of the business enjoyed by the defendants is due to the strength of their patents, the superiority of their machines, the service rendered them in keeping them in operating condition, and their satisfactory methods of conducting their business. They deny that the statements in Exhibit 13 to the complaint are correct, and state in their answer the number of different machines made by them in use, and those made by competitors.

The answers also plead as res adjudicata the decree in the former action between the same parties, referring to the cause in which the opinions of the judges sitting in the District Court are reported in 222 Fed. 349, and the opinion of the Supreme Court, affirming the decree of the District Court, in 247 U. S. 32, 38 Sup. Ct. 473, 62 L. Ed. 968. The opinions of the judges, in the District Court, set out fully the issues involved in that case, which makes it unnecessary to repeat them.

Leo A. Rogers and Elias Field, Sp. Asst. Attys. Gen. (La Rue Brown, of Boston, Mass., on the brief), for the United States.

Chas. F. Choate, Jr., of Boston, Mass., Cordenio A. Severance, of St. Paul, Minn., Frederick P. Fish, of Boston, Mass., Chester H. Krum, of St. Louis, Mo., Malcom Donald and William A. Sargent, both of Boston, Mass., and Douglas W. Robert, of St. Louis, Mo., for defendants.

TRIEBER, District Judge (after stating the facts as above). The evidence adduced by the parties is very voluminous. It consists of 26 printed volumes of oral testimony, and in addition thereto 4 large volumes of copies of leases, leases used before as well as since the enactment of the Clayton Act; copies of the record of the former action between the same parties under the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), reported in 222 Fed. 349, and 247 U. S. 32, 38 Sup. Ct. 473, 62 L. Ed. 968, pleaded as res adjudicata; numerous exhibits of shoes in their various stages of manufacture. some of them made on machines leased from the defendants and others on machines of competitors; duplicate parts for defendants' machines, and many other articles connected with them, which it is needless to mention. Several weeks have been spent in reading the evidence and comparing it with the evidence in the former case between the same parties under the Sherman Act, and it shows but slight differences and warrants the findings made in that case that the defendants have not acted oppressively in the enforcement of the forfeiture clauses complained of; that their machines are of excellent quality; that the services rendered by them in the installment of the machines, instructions to operators, promptness in furnishing them when desired by shoe manufacturers, and making repairs and replacements of broken and worn-out parts expeditiously—these are no doubt of great value to their lessees. It is also shown that, when improvements in any of the leased machines are made, they are furnished in place of the older machines without extra charge. All these claims are satisfactorily established by the evidence, and the court so finds. It is therefore unnecessary to review the testimony or make any further special findings of fact on these issues.

It is also shown that all their machines are protected by patents granted prior to October 15, 1914, and the validity of none of these patents is questioned. The only additional findings of fact necessary to make are that lessees, using machines of competitors in violation of the terms of any of the leases, had their attention called to the forfeiture provisions in the leases, which was understood by many of the lessees as warnings, in the nature of threats, that unless discontinued these covenants of the leases would be enforced. If these warnings were not promptly heeded, and machines of competitors discarded, defendants would refuse to supply shoe manufacturers with additional machines, except on the unrestricted or initial payment plans hereinafter more fully referred to, and payment of the full royalties as provided in the leases would be exacted, as if the shoes had been manufactured wholly on defendants' machines. The opinion will therefore be confined to the other issues raised by the pleadings, mostly issues of law.

Before passing on these issues, a motion of defendants to strike certain evidence of witnesses for the plaintiff should be disposed of.

## I. Objections to Testimony.

The testimony objected to was that of several witnesses introduced by the plaintiff, who were officers and salesmen of competitors of

264 F.—10

the defendants in the manufacture of some shoe machinery. Their testimony was to the effect that a number of shoe manufacturers, whom they named, informed them, when solicited to purchase machinery of their principals, that they were anxious to purchase them, but were unable to do so, as they had to use some of the defendants' patented machines, and they had been threatened that they would be compelled, and in some instances had been forced, to pay the full royalties stipulated in the defendants' leases for all shoes, on which some operations were made on machines leased from them, although a great deal of the work was performed on machines of competitors; that other shoe manufacturers had previously purchased machines of witnesses' manufacture, but declined to purchase additional ones, although they stated that they found them more economical than those of the defendants. The reasons they gave were that, if they used any machines not leased from the defendants, they could not obtain additional machines from them as they needed them, except upon initial payments under the unrestricted leases; that such payments required large sums of money, and would not reduce the royalties to the same extent as if they used exclusively machines leased from the defendants.

To sustain the objection, counsel for defendants relied on Buckeye Powder Co. v. Du Pont Powder Co., 248 U. S. 55, 39 Sup. Ct. 38, 63 L. Ed. 123, while counsel for plaintiff cited Lawlor v. Loewe, 235 U. S. 522, 35 Sup. Ct. 170, 59 L. Ed. 341. The conclusions reached make it unnecessary to rule on these objections. Their testimony on that issue is merely cumulative. The same facts were testified to by a number of shoe manufacturers—Milton Adler, of Julian & Kolenge Company; Fred H. Dow, of the Plant & Butler Shoe Company; Milton S. Florsheim, of the Florsheim Shoe Company; William W. Gates, of the Irving-Drew Company; Joseph E. Groat, of the B. A. Corbin & Sons Company; Fred J. Mayer, of the F. Mayer Boot & Shoe Company; F. C. Rand, of the International Shoe Company; George W. Dobbins, of the Witherell & Dobbins Company; Joseph F. Gardella, of the Wingate Shoe Corporation; Charles H. Jones, of the Commonwealth Shoe & Leather Company; Henry L. Nunn, of the Nunn & Bush Shoe Company; Pearl E. Selby, of the Drew-Selby Company; Emanuel F. Selz, of Selz-Schwab & Company; Thomas H. Shinn, of Curtis, Jones & Co.; John E. Williams, of the Excelsior Shoe Company.

II. Is the Act Unconstitutional as to Patents Secured Prior Thereto?

[1] It is claimed on behalf of defendants that section 3 of the Clayton Act, so far as it applies to the tying clauses in the leases of machines, which are protected by patents in force at the time of its enactment, is unconstitutional, as it tends to deprive the patentees of a vested right, in violation of the Fifth Amendment to the Constitution. In determining this question it must not be lost sight of that this act was enacted under the commerce clause of the Constitution, and is limited to interstate commerce, as shown by section 1. How broad the powers of Congress under the commerce clause are has

been determined so many times that it will serve no useful purpose to cite authorities, except some few later referred to.

The contention on behalf of defendants is that, prior to and at the time of the enactment of the Clayton Act, it was the law, as had been uniformly held by the courts, including the Supreme Court of the United States, that terms and restrictions such as are contained in the leases and attacked in this action—

"were not offensive to the letter or policy of the law and were entitled to the sanction of the law; * * * that, if construed to apply to leases of machines protected by existing patents, it destroys a large part of the value of the patents, as both patents, leases, and contracts are property, and entitled to the protection of the guaranties of the Constitution."

[2] It is true that patents are property, but it is equally true that—

"the patentee receives nothing from the law which he did not have before, and that the only effect of his patent is to restrain others from manufacturing, using, or selling that which he had invented. The patent law simply protects him in the monopoly of that which he has invented and has described in the claims of his patent." Motion Picture Co. v. Universal Film Co., 243 U. S. 502, 510, 37 Sup. Ct. 416, 418 (61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959) and authorities there cited.

[3] There is nothing in the laws relating to patents which in any wise affects contracts for license, use, sale, or lease of patented articles. They are subject to the same governmental and legislative control as other contracts. In United States v. Standard Sanitary Mfg. Co. (C. C.) 191 Fed. 172, 190, it was held:

"A patentee is as much subject to the laws of the land as is any other man. * * * It does not give a right * * * to sell indulgences to violate the law of the land, be it the Sherman Law or another."

Upon appeal this decree was affirmed. 226 U. S. 20, 48, 49, 33 Sup. Ct. 9, 14, 15 (57 L. Ed. 107). Mr. Justice McKenna, who delivered the unanimous opinion of the court, said:

"The agreements clearly, therefore, transcend what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. * * * Rights conferred by patents are indeed very definite and extensive, but they do not give, any more than other rights, a universal license against positive prohibitions. The Sherman Law is a limitation of rights—rights which may be pushed to evil consequences, and therefore restrained."

In Boston Store v. American Graphophone Co., 246 U. S. 25, 38 Sup. Ct. 261, 62 L. Ed. 551, Ann. Cas. 1918C, 447, the court said:

"There can be equally no doubt that the power to make it [price fixing after sale] in derogation of the general law was not within the monopoly conferred by the patent law, and that the attempt to enforce its apparent obligations, under the guise of a patent infringement, was not embraced within the remedies given for the protection of the rights which the patent law conferred."

See, also, Virtue v. Creamery Package Co., 227 U. S. 8, 32, 33 Sup. Ct. 202, 57 L. Ed. 393 and Thomsen v. Cayser, 243 U. S. 66, 85, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322.

Mr. Justice Clarke, in the Motion Picture Case, said:

"In interpreting this language of the statute it will be of service to keep in mind three rules long established by this court, applicable to the patent law and to the construction of patents, viz.:

"(1) The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification. These so mark where the progress claimed by the patent begins and where it ends that they have been aptly likened to the description in a deed, which sets the bounds to the grant which it contains. It is to the claims of every patent, therefore, that we must turn when we are seeking to determine what the invention is, the exclusive use of which is given to the inventor by the grant provided for by the statute. 'He' can claim nothing beyond them.'"

In referring to the Button Fastener Case, 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728, which applies also to Henry v. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880, the learned Justice, on page 514 of the opinion in 243 U. S. (37 Sup. Ct. 420, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959), said:

"This decision proceeds upon the argument that, since the patentee may withhold his patent altogether from public use, he must logically and necessarily be permitted to impose any conditions which he chooses upon any use which he may allow of it. The defect in this thinking springs from the substituting of inference and argument for the language of the statute, and from failure to distinguish between the rights which are given to the inventor by the patent law, and which he may assert against all the world through an infringement proceeding, and rights which he may create for himself by private contract, which, however, are subject to the rules of general, as distinguished from those of the patent, law."

In Heaton-Peninsular, etc., Co. v. Eureka Specialty Co. (the Button Fastener Case), 77 Fed. 288, 293, 25 C. C. A. 267, 272 (35 L. R. A. 728) Judge Lurton, who delivered the opinion of the court, said:

"The property right of the patentee is, after all, but a property right, and subject, as is all other property, to the general law of the land. * * * Neither the patentee, nor the machine involving his invention, nor a license for use, can be exempted from the liabilities and regulations which, in the public interest, attach to all persons and property under the general law of the land. Neither is the right to make and sell or use a patented invention or process free from the restraints imposed by the police power of the states."

To the same effect are State of Missouri v. Bell Telephone Co. (C. C.) 23 Fed. 539, 540, decided by Judge (later Mr. Justice) Brewer; State of Delaware v. D. & A. Tel. & Tel. Co. (C. C.) 47 Fed. 633, affirmed 50 Fed. 677, 2 C. C. A. 1.

Judge Brewer, in the Missouri Case, said:

"The moment he puts that property [the patented] into what I perhaps may, for lack of a better expression, define as the channels of commerce, that moment he subjects that property to the laws which control commercial transactions."

In short, individual rights, whether claimed under patents or otherwise, must be subordinated to the public good, and, unless clearly arbitrary and unreasonable, courts will respect the acts of the legislative department. There are but few public regulations which do not deprive persons of rights theretofore enjoyed. As abuses, harmful to the public, are found to exist, new laws are enacted to prevent

them, and they necessarily deprive those who practiced them of the right to continue them.

If a business is subject to regulation, the contracts made in its conduct are subject to regulation. Rast v. Van Deman & Lewis, 240 U. S. 342, 363, 36 Sup. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455.

Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058, relied on by defendants, was an action between a licensor and licensee, and on that ground was distinguished in Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 343, 28 Sup. Ct. 722, 52 L. Ed. 1086, as it must be in this action. This also applies to the Paper Bag Patent Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122, cited for defendants. That was an action for infringement of a patent. In response to the claim that the patentee had been guilty of nonuser for the full period of 17 years, the life of the patent, the court held that a patentee may do so without losing the monopoly granted by the patent laws. Its inapplicability is therefore too clear to require comment.

If the act involved herein had attempted to nullify patents or deprive patentees of the exclusive right to own and control them, counsel's contention would find support in the authorities cited, but neither the act, nor the complaint herein, attempt that.

[4] Conceding that the courts had previously sustained the right to make such leases and contracts as are attacked in this cause, it does not follow that the patentee has a vested right in them of which the Legislature may not deprive him, if in its opinion they are detrimental to the public welfare. While it is true, as claimed by counsel, that by the Tenth Amendment to the Constitution the police power is reserved to the states, it is now well settled that, as the Constitution vested in Congress the exclusive power to regulate commerce among the states and grant patents, it possesses what is akin to the police power of the states, the right to regulate acts relating to them, including licenses, sales, contracts, and leases of patented articles, especially when employed in commerce among the states or foreign states. Among the many authorities recognizing that rule of law, the following are cited: Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136; The Lottery Cases, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492; Hippolite Egg Co. v. United States, 220 U. S. 45, 31 Sup. Ct. 364, 55 L. Ed. 364; Hoke v. United States, 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905; Selective Draft Law Cases, 245 U. S. 366, 38 Sup. Ct. 159, 62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856; McKinley v. United States, 249 U. S. 397, 39 Sup. Ct. 324, 63 L. Ed. 668; Hamilton v. Kentucky, D. & W. Co., 251 U. S. 146, 40 Sup. Ct. 106, 64 L. Ed. —— (decided December 15, 1919).

In the last-cited case this same claim was made, and Mr. Justice Brandeis, in disposing of it, said:

"That the United States lacks the police power, and that this was reserved to the states by the Tenth Amendment, is true. But it is none the less true that, when the United States exerts any of the powers conferred upon it by the Constitution, no valid objection can be based upon the fact that such ex-

ercise may be attended by the same incidents which attend the exercise by a state of its police power, or that it may tend to accomplish a similar purpose. * * * But the Fifth Amendment imposes in this respect no greater limitation upon the national power than does the Fourteenth Amendment upon state power."

[5] So, even if the claim that the former decisions relied on constitute a vested right in the patentee, it would still be subject to regulation by Congress, under the commerce as well as the patent clauses of the Constitution, and in some matters to the police power of the states. Patterson v. Kentucky, 97 U. S. 501, 24 L. Ed. 1115; Webber v. Virginia, 103 U. S. 344, 347, 26 L. Ed. 565; Allen v. Riley, 203 U. S. 347, 27 Sup. Ct. 95, 51 L. Ed. 216, 8 Ann. Cas. 137; John Woods & Sons v. Carl, 203 U. S. 358, 27 Sup. Ct. 99, 51 L. Ed. 219; Ozan Lumber Co. v. Union County National Bank, 207 U. S. 251, 28 Sup. Ct. 89, 52 L. Ed. 195; Opinions of Justices, 193 Mass. 605, 609, 611, 81 N. E. 142. In Webber v. Virginia, supra, the court said:

"The legislation respecting the articles which the state may adopt after the patents have expired it may equally adopt during their continuance. It is only the right to the invention or discovery—the incorporeal right—which the state cannot interfere with. Congress never intended that the patent laws should displace the police powers of the states, meaning by that term those powers by which the health, good order, peace, and general welfare of the community are promoted. Whatever rights are reserved to inventors must be enjoyed in subordination to this general authority of the state over all property within its limits."

Can it be said that Congress may not do what the states can, in relation to matters expressly granted to it by the Constitution? It is true, as stated by counsel, that the power to regulate, as that of taxation, may result in destruction; but, as stated by Mr. Justice Holmes in Ft. Smith Lumber Co. v. State of Arkansas, 251 U. S. 532, 40 Sup. Ct. 304, 64 L. Ed. —— (opinion filed March 1, 1920):

"If the state of Arkansas wished to discourage, but not forbid, the holding of stock in one corporation by another, and sought to attain the result by this tax, or if it simply saw fit to make corporations pay for the privilege, there would be nothing in the Constitution to hinder."

This was in reply to the contention that the statute was in violation of the Fourteenth Amendment. See, also, Veasie Bank v. Fenno, 75 U. S. (8 Wall.) 533, 19 L. Ed. 482; Tanner v. Little, 240 U. S. 369, 386, 36 Sup. Ct. 379, 60 L. Ed. 691.

[6] Besides, decisions of courts do not create rights which become vested to the extent that they may not be impaired by subsequent legislation, except as they become res judicata between the parties to the action and their privies. They are rules of property which will not, for slight reasons, be changed by later decisions, but even such decisions may and have been overruled frequently. Sauer v. New York, 206 U. S. 536, 27 Sup. Ct. 686, 51 L. Ed. 1176; Moore-Mansfield Co. v. Electrical Co., 234 U. S. 619, 624, 34 Sup. Ct. 941, 58 L. Ed. 1503; Willoughby v. Chicago, 235 U. S. 45, 50, 35 Sup. Ct. 23, 59 L. Ed. 123; Ross v. Oregon, 227 U. S. 150, 161, 33 Sup. Ct. 220, 57 L. Ed. 458, Ann. Cas. 1914C, 224. In the Motion Picture Case the right upheld in Henry v. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann.

Cas. 1913D, 880, was denied, and that case overruled. Can it be said that the Legislature is powerless to do what the courts are frequently doing, when they overrule former decisions?

No person has a vested right, under the common law or decisions of courts, entitling him to insist that it shall remain unchanged for his benefit, although in the opinion of the Legislature it is injurious to the public welfare, and therefore subject to the police power. Munn v. Illinois, 94 U. S. 113, 134, 24 L. Ed. 77; Second Employers' Liability. Cases, 223 U. S. 1, 50, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44; New York Central R. R. v. White, 243 U. S. 188, 198, 37 Sup. Ct. 247, 61 L. Ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629, reaffirmed in Arizona Employers' Liability Cases, 250 U. S. 400, 39 Sup. Ct. 553, 63 L. Ed. 1058, and Chicago, Rock Island, etc., Ry. v. Cole, 251 U. S. 54, 40 Sup. Ct. 68, 64 L. Ed. —— (opinion filed December 8, 1919).

Of course, this does not apply to vested rights under a statute or contract based on a valuable consideration, and not subject to the police power. In Satterlee v. Mathewson, 27 U. S. (2 Pet.) 380, 413 (7 L. Ed. 458), the court said:

"It is true that the Supreme Court of the state decided, in the year 1825, that this contract, being entered into with a person claiming under a Connecticut title, was void; so that the principle of law which has been mentioned did not apply to it. But the Legislature afterwards declared, by the act under examination, that contracts of that nature were valid, and that the relation of landlord and tenant should exist and be held effectual, as well in contracts of that description as in those between other citizens of the state. * * * The objection, however, which was most pressed upon the court, and relied upon by the counsel for the plaintiff in error, was that the effect of this act was to divest rights which were vested by law in Satterlee. There is certainly no part of the Constitution of the United States which applies to a state law of this description; nor are we aware of any decision of this, or of any circuit court, which has condemned such a law, upon this ground, provided its effect be not to impair the obligation of a contract, and it has been shown that the act in question has no such effect upon either of the contracts which have been before mentioned."

This was reaffirmed in Charles River Bridge Co. v. Warren Bridge Co., 36 U. S. (11 Pet.) 420, 539, 9 L. Ed. 773. In that case it was said:

"It is well settled by the decisions of this court that a state law may be retrospective in its character, and may divest vested rights. and yet not violate the Constitution of the United States, unless it also impairs the obligation of a contract."

[7] Another ground which makes this claim untenable is that a statute addressed to no particular person does not constitute a contract, and therefore creates no vested right, and may be repealed at any time. In Salt Co. v. East Saginaw Co., 80 U. S. (13 Wall.) 373, 20 L. Ed. 611, the state of Michigan, for the purpose of encouraging the manufacture of salt, by a general statute addressed to no particular person or corporation, offered a bounty upon salt produced in the state, and exempted from taxation the property engaged in the business. After a time the act was repealed. The claim was that the exemption constituted a contract, and could not be repealed without impairing the obligation of the contract. But the court denied this

claim, and held that the exemption did not constitute a contract, but was nothing more or less than a law dictated by public policy for the encouragement of an industry. So long as the law was in force the state promised the exemption and bounty; but there was no pledge that it should not be repealed at any time. In Wisconsin & Michigan Ry. v. Powers, 191 U. S. 379, 385, 387, 24 Sup. Ct. 107, 108 (48 L. Ed. 229), the court, referring to the Salt Company Case said, "It pointed out the distinction between an exemption in a special charter and a general encouragement to all persons to engage in a certain enterprise," and again held that an exemption addressed to no one in particular constitutes a mere announcement of policy, not constituting a contract, and therefore subject to repeal at any time. See, also, Banning Co. v. California, 240 U. S. 142, 153, 36 Sup. Ct. 338, 60 L. Ed. 569. The patent laws of the United States are addressed to no one in particular, but dictated by public policy, restrained only by the Constitution, that the patent "secure for limited time to inventors the exclusive right to their discovery."

[8] Besides, there is nothing in the national Constitution which prohibits Congress or a state from nullifying existing contracts, if, in the opinion of the legislative department, based on substantial grounds, they are injurious to the public. All contracts for a definite period must be taken to have been made subject to a possible change by law, under the police power, if the public welfare demands it, and this is to be determined by the lawmakers. Legal Tender Cases, 79 U. S. (12 Wall.) 457, 20 L. Ed. 287; Armour Packing Co. v. United States, 209 U. S. 56, 82, 28 Sup. Ct. 428, 52 L. Ed. 681; Louisville & Nashville R. R. v. Mottley, 219 U. S. 467, 478, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Mondou v. N. Y., N. H. & H. R. R. R., 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44; Chicago, B. & Q. R. R. v. McGuire, 219 U. S. 549, 567, 31 Sup. Ct. 259, 55 L. Ed. 328; Chicago & Alton R. R. v. Tranbarger, 238 U. S. 67, 74, 35 Sup. Ct. 678, 59 L. Ed. 1204; Union Dry Goods Co. v. Georgia P. S. Corporation, 248 U. S. 372, 376, 39 Sup. Ct. 117, 63 L. Ed. 309; Producers' Transportation Co. v. Railroad Commission, 251 U. S. 228, 40 Sup. Ct. 131, 64 L. Ed. —— (opinion filed Jan. 5, 1920); Manigault v. Ward (C. C.) 123 Fed. 707, 719, affirmed Manigault v. Springs, 199 U. S. 473, 26 Sup. Ct. 127, 50 L. Ed. 274.

In the Mottley Case it was said:

"It is said, however, that, as the contract of Mottley and wife with the railroad company was originally valid, it cannot be supposed that Congress intended by the act of 1906 to annul or prevent its enforcement. But the purpose of Congress was to cut up by the roots every form of discrimination, favoritism, and inequality, except in the cases of certain excepted classes, to which Mottley and his wife did not belong, and which exceptions rested upon peculiar grounds."

In the Union Dry Goods Co. Case the court quotes with approval what was said in the Legal Tender Cases, that—

"Contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of contract can extend to defeat the legitimate governmental authority."

In the McGuire Case it was held:

"The right to make contracts is subject to the exercise of the powers granted to Congress for the suitable conduct of matters of national concern."

McClurg v. Kingsland, 42 U. S. (1 How.) 202, 11 L. Ed. 102, cited by defendants, fails to sustain their contention; in fact, in the court's opinion, it is against it. One of the exceptions assigned as error in that case was the part of the charge of the trial judge that—

"The facts of the case which were not controverted brought it within the provisions of the seventh section of the act of Congress of March 3, 1839 (5 Stat. 354), by the unmolested, notorious use of the invention before the application for the patent."

When the patent was granted and the action instituted, the acts of February 21, 1793 (1 Stat. 318), and of April 17, 1800 (2 Stat. 37), were in force, but were repealed by section 21 of the act of July 4, 1836 (5 Stat. 125). The seventh section of the act of March 3, 1839, was in these words:

"That every person or corporation who has, or shall have, purchased or constructed any newly invented machine, manufacture, or composition of matter, prior to the application by the inventor or discoverer for a patent, shall be held to possess the right to use, and vend to others to be used, the specific machine, manufacture, or composition of matter so made or purchased, without liability therefor to the inventor, or any other person interested in such invention; and no patent shall be held to be invalid by reason of such purchase, sale, or use prior to the application for a patent as aforesaid, except on proof of abandonment of such invention to the public; or that such purchase, sale, or prior use has been for more than two years prior to such application for a patent."

The court, after holding that the repeal of the acts of 1793 and 1800 by the act of 1836 could not impair the right of property then existing in the patentee, sustained the construction by the trial judge of the seventh section of the act of 1839, and affirmed the judgment, saying:

"The object of this provision is evidently twofold: First, to protect the person who has used the thing patented, by having purchased, constructed, or made the machine, etc., to which the invention is applied, from any liability to the patentee or his assignee; second, to protect the rights, granted to the patentee, against any infringement by any other persons. This relieved him from the effects of former laws and their constructions by this court, unless in case of an abandonment of the invention, or a continued prior use for more than two years before the application for a patent, while it puts the person who has had such prior use on the same footing as if he had a special license from the inventor to use his invention, which, if given before the application for a patent, would justify the continued use after it issued without liability."

Choate v. Trapp, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941, is another authority relied on by the defendants as conclusive. The part of the act of Congress (Curtis Act June 28, 1898, 30 Stat. 495, 507) which was repealed before the expiration of the time for which the lands of these Indians were exempted from all taxation (Act May 27, 1908, 35 Stat. 312), provided for allotting to them some of the lands owned by the tribe in severalty, and which, for the period of 21 years, were to be exempted from taxation. It was held that the Indians had

a vested right in the exemptions for the period specified in the act, of which they could not be divested by later acts. But the reasons given by the court for the conclusion reached show conclusively its inapplicability to the case at bar. The court held that the Indians had an equitable interest in the lands which it was desired to have satisfied and extinguished. The Curtis Act was framed with a view to having these claims satisfactorily settled. The offer by Congress, to make the lands allotted nontaxable upon relinquishment by them to the government of some of their lands, was accepted by them, and this relinquishment was a part of the consideration for the exemption from taxation of the allotted lands. The acceptance of the terms, it was held, was a consideration sufficient to entitle the Indians to enforce whatever rights were conferred. In distinguishing other cases, the court, after referring to the facts in those cases, said:

"There was no consideration moving from one to the other. Such exemption was a mere bounty, valuable as long as the state chose to concede it; but, as tax exemptions are strictly construed, it could be withdrawn at any time the state saw fit. But in the government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than 100 years and has been applied in tax cases."

Other cases cited by defendants are to the effect that a patentee may not be deprived of the exclusive right to the monopoly of his invention by infringers, including the government. Paper Bag Patent Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122; Cramp & Sons v. Cutris Turbine Co., 246 U. S. 48, 38 Sup. Ct. 271, 62 L. Ed. 560; and other cases cited by defendants. No such issue is involved in this action. Counsel confound the right to the exclusive use of the invention with the right to make contracts for its use.

[9] The conclusion reached is that, while Congress cannot deprive a patentee of the exclusive use of the patent, or reduce the time for which it is granted by existing law, without violating the Fifth Amendment, a patentee has no vested right in conditions of contracts for use, license, or lease of his patented invention, which Congress may not prohibit, if in its judgment they are injurious to the public welfare, though he may have possessed that right under the common or municipal law, as theretofore construed by the courts. A patentee may exclude all others from the use of it; he may withhold it entirely from the public, if he so desires; but, when he enters into contracts for the use of it, his contracts are subject to regulation by legislative act, if deemed necessary for the protection of the public, though subject to judicial review. But this review by the courts is limited to only one matter; i. e., is there any reasonably substantial ground for the regulation, or is it arbitrary and without any substantial reason? The wisdom of the act is beyond the power of the courts to question. No citation of authorities is required to these propositions, as they are firmly established and beyond question.

### III. Is the Plea of Res Adjudicata Good?

[10] The plea raises the issue whether the decree in the former action under the Sherman Act, between the same parties, owing to the fact that the provisions in the leases, now sought to have declared void as being in violation of section 3 of the Clayton Act, were in the complaint in that cause set out and relied on in part to obtain the relief asked, is res adjudicata in this action?

The opinions in that case are reported in 222 Fed. 349, and 247 U. S. 32, 38 Sup. Ct. 473, 62 L. Ed. 968. That action was instituted December 12, 1911, nearly three years before the enactment of the Clayton Act, and finally heard before, although decided by the trial court after, the Clayton Act had become a law. Judge Putnam, the presiding judge at the hearing of that case in the District Court, which was heard by three judges under the Expedition Act (Comp. St. §§ 8824, 8825), in referring to the Clayton Act, said (222 Fed. on page 361):

"In this connection we make no special reference, and have come to no conclusions, in regard to the effect on the pending case of the legislation of Congress enacted since this case was submitted to us, nor with reference to the question whether or not the rights of the parties affected by this legislation would require supplemental pleadings."

Judge Brown, another of the judges sitting in that case in the District Court, referring to the leases complained of in this action, said:

"It is also alleged that certain lease and license agreements constitute steps in carrying out such project."

Judge Dodge, another judge sitting in the District Court, in his concurring opinion in that case (222 Fed. 391), referring to the tying clauses in the leases, said:

"The complaints made regarding the leases embodying the clauses [the tying clauses] referred to are not directed against those pertaining to any particular kind or kinds of machines, as more objectionable than others. It is their entire combined effect which is attacked."

Mr. Justice McKenna, who delivered the opinion of the majority of the court, in the beginning of the opinion (247 U. S. 35, 38 Sup. Ct. 474, 62 L. Ed. 968) states the object of the bill to be:

"The charge of the bill is that defendants, not being satisfied with the monopoly of their patents and determined to extend it, conceived the idea of acquiring the ownership or control of all concerns engaged in the manufacture of all kinds of shoe machinery. This purpose was achieved, it is charged, and a monopoly acquired, and commerce, interstate and foreign, restrained by the union of competing companies and the acquisition of others; and that leases were exacted which completed and assured the control and monopoly thus acquired."

What the defendants understood to be the issue in that action is clearly and concisely stated by their counsel in their brief (the same counsel representing them in the case at bar), when the cause was heard in the Supreme Court on reargument. On page 11, under the caption "The Issues in the Present Case," they say:

"The issue presented in the District Court was whether the defendants formed a plan, as charged in the petition: (1) To acquire all concerns engaged in manufacturing shoe machinery, or (if the limitation insisted on by the United States be accepted) to acquire all concerns engaged in manufacturing certain specified classes of shoe machinery; and (2) thereupon to refuse to lease any essential machines, unless the shoe manufacturer took practically all his other machines from them; and, if they did form such a plan, whether or not such a plan was unlawful, and whether they carried out the plan and thereby acquired an unlawful monopoly."

But it is claimed on behalf of the defendants that, as in the complaint in that case, although an action under the Sherman Act, the tying clauses complained of in the instant case were specifically charged to be unlawful and put in issue, the decree in that action is res adjudicata.

A careful reading of the complaint and the opinions in that case convinces that they were set out solely for the purpose of maintaining the charge that by their use, in connection with the other acts charged, the defendants had conspired in restraint of trade or commerce and monopolized it. The government certainly could not have pleaded in its complaint the invalidity of these clauses in the leases under the Clayton Act, which was not a law at that time.

To obtain the relief in that case the complaint charged that the defendants, by combinations with other shoe machinery manufacturers and the acquisition of the business of competitors, had obtained a monopoly of the foreign trade and commerce in shoe machinery, in restraint of trade, in violation of the Sherman Act, and that they had succeeded in that object. Among the numerous alleged unlawful acts charged, which made it possible for them to achieve that object, was the insertion of these tying clauses in the leases. But this was only one of the acts charged, to accomplish the result complained of. This allegation was therefore collateral to the main issue, and could only have been incidentally considered by the court. In this action no attack is made on any of the acts complained of, and which were the basis of the former suit, except the tying clauses. Nor is the object of the suit the same. The only relief now asked is against those acts of the defendants which are claimed to be in violation of section 3 of the Clayton Act. In the complaint it is alleged:

"The bill does not complain of the leases as a whole, but only parts thereof, which are described in the bill as 'tying clauses' and 'discounts and rebates.'"

The object of the former suit was, as appears from the prayer for relief in the complaint, that—

"the defendants be declared a combination in restraint of interstate and foreign trade and commerce, and attempting, in combination and conspiracy with other persons and corporations, to monopolize and have monopolized part of the trade and commerce among the several states of the United States and with foreign nations, * * * and that each of them be dissolved and separated into such parts that no one of them will constitute a monopoly, or can become a monopoly, of the shoe machinery business," etc.

When a judgment or decree has the effect of res adjudicata in a later action between the same parties is well settled by numerous decisions of the English and American courts. The principle estab-

lished in the Duchess of Kingston's Case, 20 Howell's State Trials, 355, 538, 2 Smith's Lead. Cases, 424 (decided in 1776), has been generally followed by the American courts, including the Supreme Court of the United States. Leading cases of that court are Washington, A. & G. Co. v. Sickles, 65 U. S. (24 How.) 333, 16 L. Ed. 650; Cromwell v. County of Sac, 94 U. S. 351, 24 L. Ed. 195; Reynolds v. Stockton, 140 U. S. 254, 270, 11 Sup. Ct. 773, 35 L. Ed. 464.

In the Sickles Case it was held:

"The essential conditions under which the exception of res judicata becomes applicable are the identity of the thing demanded, the identity of the cause of the demand, and of the parties in the character in which they are litigants."

It is equally well settled that estoppel by judgment does not extend to matters which were only collaterally involved in the former litigation. Duchess of Kingston's Case, supra; Hopkins v. Lee, 19 U. S. (6 Wheat.) 109, 114, 5 L. Ed. 218; Gaines v. Hennen, 65 U. S. (24 How.) 553, 579, 16 L. Ed. 770; Bluefield S. S. Co. v. United Fruit Co., 243 Fed. 1, 11, 155 C. C. A. 531; Smith v. Town of Ontario (C. C.) 4 Fed. 386, 390; Cavanaugh v. Buehler, 120 Pa. 441, 14 Atl. 391; Belden v. State, 103 N. Y. 1, 8 N. E. 363; Waterhouse v. Levine, 182 Mass. 407, 65 N. E. 822. In the Duchess of Kingston's Case the court, after stating when a former judgment will sustain the plea, said:

"But neither the judgment of a concurrent or exclusive jurisdiction is evidence of any matter, which came collaterally in question, though within their jurisdiction, nor of any matter incidentally cognizable, nor of any matter to be inferred by argument from the judgment."

In Hopkins v. Lee it was held:

"To points which came only collaterally under consideration, or were only incidentally under cognizance, or could only be inferred by arguing from the decree, it is admitted that the rule does not apply."

Vicksburg v. Vicksburg Waterworks Co., 206 U. S. 496, 506, 508, 27 Sup. Ct. 762, 51 L. Ed. 1155, is much in point. There was a plea of res adjudicata based on the decree affirmed in 202 U. S. 453, 26 Sup. Ct. 660, 50 L. Ed. 1102, 6 Ann. Cas. 253. The issues involved in that action are set out in 206 U. S. 506, 507, 27 Sup. Ct. 762, 51 L. Ed. 1155. The court, in disposing of the plea, said:

"But a decree must be read in the light of the issues involved in the pleadings and the relief sought, and we are of the opinion that the matters now litigated were not involved in or disposed of in the former case, and that, when properly construed, the decree does not finally dispose of the right of the city to regulate rates under a law passed after the contract went into effect and long after the bill was filed in the case."

This was reaffirmed in Vicksburg v. Henson, 231 U. S. 259, 273, 34 Sup. Ct. 95, 100 (58 L. Ed. 209), where it was said:

"The nature and extent of the former decree is not to be determined by seizing upon isolated parts of it, or passages in the opinion considering the rights of the parties, but upon an examination of the issues made and intended to be submitted, and what the decree was really designed to accomplish. We cannot agree with the court below, or with the majority of the Circuit

Court of Appeals, that the effect of the former adjudication was to preclude the rights of the parties in the present controversy."

All that was and could be determined on the pleadings in the former action under the Sherman Act, was that, applying the rule laid down in the Standard Oil Co. Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and American Tobacco Co. Case, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, for the construction of the Sherman Act, the evidence failed to sustain the charge that the Shoe Machinery Company had violated that act, and therefore the alleged combination should not be dissolved.

The plea cannot be sustained.

### IV. Were the Defendants, in Making the Leases Attacked, Engaged in Interstate Commerce?

[11] That leases may constitute interstate commerce was determined by this court on the motion to dismiss the complaint. 234 Fed. 127, 143, 144. Of course, this does not apply to leases of machines in the state of Massachusetts, when the machines were made and delivered in that state. Witherell & Dobbins Co. v. United Shoe Machinery Co. (First Circuit, opinion filed June 18, 1919, not published, as motion for rehearing granted). As to leases made with manufacturers in states other than the state of Massachusetts, the claim of defendants that they are not in the course of interstate trade is sought to be sustained upon the ground that all leases, made prior to the enactment of the Clayton Act, were only presented to the lessee for signature and executed by him after the machines had been set up and were in operation, regardless of the fact from what state the defendants shipped them. The custom then prevailing was: The shoe manufacturer would notify the local representative of the defendants that he desired to lease certain machines, whereupon a blank printed order, prepared and furnished by the defendants, would be handed to him. He would then insert in a blank left for that purpose the kind of machine or machines he desired and sign the application. The order is:

"Please deliver to the undersigned, upon the terms and conditions hereinafter stated, for use in the factory of the undersigned at (insert St. Louis, Mo., or wherever the factory is located) the machines," etc.

It also contains an obligation that he will hold the machines at his sole risk from injury, loss, or destruction by fire or otherwise, pay all taxes assessed and levied on them, will render full and accurate reports of the use of the machines, pay the rental and royalty established by the defendants, and pay all shipping and transportation charges, both to and from the factory of the Machinery Company. The order would then be sent to the home office of the defendant Maine company in the state of Massachusetts, and, if accepted, the machines would be shipped from Massachusetts, consigned to itself. Upon their arrival at the destination, they would be taken from the carrier by defendants' agent and installed in the shoe factory, and, when set up and put in operation, the lease would be executed. This, it is claimed, makes the transaction intrastate, and therefore not subject

to the Clayton Act. The court is unable to sustain this contention, as it has been uniformly held that acts of this nature constitute interstate commerce. Brennan v. Titusville, 153 U. S. 289, 14 Sup. Ct. 829, 38 L. Ed. 719; Caldwell v. North Carolina, 187 U. S. 622, 23 Sup. Ct. 229, 47 L. Ed. 336; Rearick v. Pennsylvania, 203 U. S. 507, 27 Sup. Ct. 159, 51 L. Ed. 295; Dozier v. Alabama, 218 U. S. 124, 30 Sup. Ct. 649, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264; Crenshaw v. Arkansas, 227 U. S. 389, 33 Sup. Ct. 294, 57 L. Ed. 565; Western Oil Refining Co. v. Lipscomb, 244 U. S. 346, 37 Sup. Ct. 623, 61 L. Ed. 1181.

The cases cited and relied on by the defendants are clearly inapplicable. Banker Bros. v. Pennsylvania, 222 U. S. 210, 32 Sup. Ct. 38, 56 L. Ed. 168, was an action involving the right of the state to tax the defendants on sales of automobiles made in Pittsburgh, Pa. The facts were that the defendants kept no machines in stock, but would obtain them from the manufacturers in another state. A purchaser would order the machine from the defendants in Pennsylvania; the order being addressed to the defendants, the manufacturer's name (the Pierce Company) not appearing on the order. The defendants would forward the order to the Pierce Company, who would ship it to the defendants, at Pittsburgh, Pa., with draft on defendants attached to the bill of lading, less the commission. On paying the draft, the Banker Bros. would take up the bill of lading, receive the car from the carrier, and then deliver it to the buyer on his paying the balance of the purchase money. It was held that the Banker Bros. had the title and the shipment had become at rest in the state of Pennsylvania, though shipped in interstate commerce, and therefore subject to the tax imposed by the state. The court said:

"This is one of the common cases in which parties find it to their interest to occupy the position of vendor and vendee for some purposes under a contract containing terms which, for the purpose of restricting sales and securing payment, come near to creating the relation of principal and agent. But as between Banker Bros. Company and the Pittsburgh purchaser, there can be no doubt that it occupied the position of vendor. As such it was bound by its contract to him and under the duty of paying to the state a tax on the sale. The name of the Pierce Company was not mentioned in the order signed by the purchaser. Had there been a breach of its terms, he would have had a cause of action against the Banker Bros. Company, with whom alone he dealt. If he had failed to complete the purchase, the Pierce Company would have no right to sue him on the contract."

In Browning v. Waycross, 233 U. S. 16, 34 Sup. Ct. 578, 58 L. Ed. 828, it was held that a city or state may impose an occupation tax on lightning rod agents, not for taking orders to be filled in another state and delivered in the state where the order was taken, but "on persons engaged in putting up or erecting lightning rods." In Bacon v. Illinois, 227 U. S. 504, 33 Sup. Ct. 299, 57 L. Ed. 615, what the court held was:

"Property brought from another state, and withdrawn from the carrier, and held by the owner with full power of disposition, becomes subject to the local taxing power, notwithstanding the owner may intend to ultimately forward it to" another state.

Mr. Justice Hughes, who delivered the opinion of the court, said:

"The purpose of the withdrawal did not alter the fact that it had ceased to be transported and had been placed in his hands. He had the privilege of continuing the transportation under the shipping contracts, but of this he might avail himself or not, as he chose. He might sell the grain in Illinois, or forward it, as he saw fit. It was in his possession, with the control of absolute ownership. He intended to forward the grain after it had been inspected, graded, etc.; but this intention, while the grain remained in his keeping and before it had been actually committed to the carriers for transportation, did not make it immune from local taxation. He had established a local facility in Chicago for his own benefit, and while, through its employment, the grain was there at rest, there was no reason why it should not be included with his other property within the state in an assessment for taxation, which was made in the usual way, without discrimination."

Singer Sewing Machine Co. v. Brickell, 233 U. S. 304, 34 Sup. Ct. 493, 58 L. Ed. 974, is clearly against defendants' contention, reaffirming Crenshaw v. Arkansas, 227 U. S. 389, 33 Sup. Ct. 294, 57 L. Ed. 565. Without reviewing the other authorities cited, it is sufficient to say that none is applicable to the facts in the instant case.

The mode of operation since the enactment of the Clayton Act differs from that pursued theretofore. The blank forms furnished by the defendants to shoe manufacturers desiring to lease machines from them are headed: "Order and Temporary Loan Agreement." The applicant for the lease applies to the company, by inserting in a blank left for that purpose in the order blank furnished by the defendants, the machines wanted. The application contains all the conditions upon which the machines are to be leased, and is signed by the applicant. Below the signature of the applicant is the following:

"We accept your order as above, and are shipping to you the machines designated in the above schedule of machines, in accordance with and subject to the foregoing terms and conditions.
        "[Signed]   United Shoe Machinery Company, By ————."

This would indicate that the machines are shipped from the state of Massachusetts direct to the shoe manufacturer; but the evidence shows that the machines are not consigned to the applicant, but are shipped in the same manner as under the former leases, and the acceptance of the application is only delivered, when they are set up and ready for operation. Construing the leases as they are printed they are clearly contracts in commerce among the states. Mobile County v. Kimball, 102 U. S. 691, 702, 26 L. Ed. 238, and authorities cited supra.

But the evidence also established that when the machines reach the place of destination they are not stored or held subject to the defendants' order or disposal, but are immediately taken to the applicant's factory and there installed. Whether the installation is a part of the interstate transaction is not in issue in this action but see Swift v. United States, 196 U. S. 375, 395, 396, 398, 25 Sup. Ct. 276, 49 L. Ed. 518; Loewe v. Lawlor, 208 U. S. 274, 301, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Boyle v. United States, 259 Fed. 803, 806, —— C. C. A. ——.

[12] The conclusion of the court is that the leases, except when made with manufacturers located in the state of Massachusetts and

delivered there, are in commerce or trade among the states. The exception also applies to machines taken from one lessee and delivered to another in the same state, which the evidence shows is occasionally done, when a lessee refuses a machine and another manufacturer in that city or state leases it.

## V. The Distinction Between the Sherman and Clayton Acts.

The first and second sections of the Sherman Act were construed by Mr. Chief Justice White in Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. Without quoting from the opinion, reference is made to what is said in that opinion on pages 50, 51, 59, 60, 62–64 of 221 U. S., on pages 512, 515–517 of 31 Sup. Ct. (55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734). The same construction was given to that act in United States v. American Tobacco Co., 221 U. S. 106, 179, 31 Sup. Ct. 632, 55 L. Ed. 663. In Nash v. United States, 229 U. S. 373, 376, 33 Sup. Ct. 780, 781 (57 L. Ed. 1232) referring to these cases, it is said:

"Those cases may be taken to have established that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade."

Again in United States v. Colgate Co., 250 U. S. 300, 39 Sup. Ct. 465, 63 L. Ed. 992, it is said:

"The purpose of the Sherman Act is to prohibit monopolies, contracts, and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or wish to engage, in trade and commerce—in a word, the right of freedom to trade."

There is nothing in the Sherman Act, or any other act of Congress, making the acts enumerated in section 3 of the Clayton Act unlawful, "where the effect" of them "may be to substantially lessen competition or tend to create a monopoly in any line of commerce." Section 1 of the Sherman Act (Comp. St. § 8820) makes unlawful "contract * * * in restraint of trade or commerce," and as construed by the Supreme Court in the above-cited cases, they mean "contracts which *unduly* restrain trade and commerce." This language differs materially from the language used in section 3 of the Clayton Act. That contracts or leases may substantially lessen competition was not sufficient to make them unlawful under the Sherman Act, if not unduly or oppressively enforced, as was held in the cases hereinbefore cited.

The second section of the Sherman Act makes it unlawful to monopolize or attempt to monopolize any part of such trade, while the Clayton Act makes every contract, etc., which "tend to create a monopoly in any line of commerce," unlawful.

The bill for the Clayton Act was introduced in Congress some time after the opinions in the Standard Oil Company and American Tobacco Company Cases had been announced, and Congress, therefore, was familiar with the construction of the Sherman Act by the Supreme Court. As stated in the former opinion of this court (234 Fed. 127):

264 F.—11

"Evidently Congress was not satisfied to only prohibit actual lessening of competition, or monopolizing, but to make it unlawful for any person to do those acts, which may put it in his power to do so."

The same conclusion was reached by the Circuit Court of Appeals for the First Circuit, in Standard Fashion Co. v. Magrane & Houston Co., 259 Fed. 793, 796, —— C. C. A. ——. The reports of the House and Senate Committees, when reporting the act to their respective bodies, show that the object of this section of the act was to make unlawful acts not included in the Sherman Act. In the report of the Senate committee the purpose of this section is stated to be:

"Briefly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the act of July 2, 1890, or other existing anti-trust acts, and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation."

If it was not intended to change the law from what it was under the then existing act, its enactment was meaningless and a vain thing, a presumption courts will not indulge in when construing legislative acts. Wisconsin Central R. R. v. United States, 164 U. S. 190, 202, 17 Sup. Ct. 45, 41 L. Ed. 399.

The Clayton Act, as the court construes it, is intended as a preventive act, to arrest the creation of trusts, etc., in their incipiency and before consummation, as expressed in the President's message of January 20, 1914, urging the enactment of supplemental anti-trust legislation, and the report of the Senate Committee on the bill, while the Sherman Act, as construed, only makes unlawful, "acts, contracts and combinations, which unduly or injuriously restrain competition, or unduly or injuriously create monopolies in trade." Under that act it has been held by the Supreme Court that—

"applying the rule of reason, * * . * the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the Anti-Trust Act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or unduly obstructing the due course of trade, or which, either because of their inherent nature or effect, or because of the evident purpose of the acts, etc., injuriously restrain trade, that the words as used in the statute were designed to have and did have but a like significance." 221 U. S. 179, 31 Sup. Ct. 648, 55 L. Ed. 663.

That the acts, etc., if not unduly or injuriously exercised, may tend to have that effect, was not sufficient to make them violations of the Sherman act; or, in other words, a violation of that act depended on the manner in which it was exercised, whether unduly and injuriously or nonprejudicially.

[13] It is therefore unnecessary to determine whether the defendants, by the tying clauses and the discounts and rebates, have succeeded in unduly monopolizing or attempted to monopolize unduly any part of the trade or commerce among the several states, or have unduly restrained competition in that part of commerce: The question to be decided is: Do the clauses complained of, or any of them, put it in their power, or have the effect, or tend, if enforced, as the defend-

ants would have the right to do, if they are not unlawful under the Clayton Act—and that is their intention—"to substantially lessen competition" or "establish a monopoly in trade"?

In the opinion of the court there can be no doubt that the enforcement of some of the provisions hereinafter mentioned will have that effect. If shoe manufacturers are not permitted to use machines manufactured by competitors without being penalized, such prohibition tends to lessen competition, and eventually will result in giving the defendants a monopoly in that part of trade or commerce. Who will invest the millions necessary to establish such manufacturing plants, and the evidence convinces that it will require these large sums to establish them, when the product cannot be sold, or at best can find but a very limited market. It is true, there are some competitors; but they are few, and they manufacture only some of the machines required. Some have been obliged to go out of business for lack of trade, caused by these tying clauses, and eventually all will have to discontinue, if shoe manufacturers are prevented from purchasing, leasing, or using their machines, by reason of a strict enforcement of the tying clauses and the rebates and discounts, or those which, in the opinion of the court, are in violation of the Clayton Act. To what extent the defendants had obtained control of the business of shoe machinery at the time the former action was instituted is shown by the tabulation made by Mr. Justice Clarke in his dissenting opinion (247 U. S. 89, 38 Sup. Ct. 473, 62 L. Ed. 968). At the present time their control is much greater as will be seen from the following statement made from the evidence:

| | By Defendants. | By All Others. |
|---|---|---|
| Clicking machines | 5,595 | 17 |
| Eyeleting machines | 4,431 | 659 |
| Pulling-over machines | 2,441 | — |
| Lasting machines | 8,499 | 48 |
| Standard screw machines | 280 | — |
| Pegging machines | 23 | 1 |
| Tacking machines | 7,937 | 11 |
| McKay sewing machines | 711 | 326 |
| Welt sewing machines | 2,609 | 135 |
| Outsole stitching machines | 2,906 | 689 |
| Loose nailing machines | 2,026 | 6 |
| Heeling machines | 2,086 | 110 |
| Slugging machines | 1,718 | 12 |

From this it is established that the defendants now control more than 95 per cent. of the entire business of shoe machinery in the United States.

## VI. Choice of Independent or Unrestricted Leases.

[14] It is next claimed that lessees have the choice of independent or unrestricted leases, which do not contain the tying clauses complained of. But lessees under these leases, in addition to the fact that lessees are not relieved of royalties and are not entitled to rebates on some of the leased machines and material, as lessees under the restricted leases, nor to the benefit of the same discounts, are also required

to make initial payments on each machine leased. Many of these initial payments are over 100 per cent. greater than the payments required under the restricted leases. The schedule of these initial payments, furnished the court by counsel for the defendants, shows that the average increase is about 50 per cent., although on some machines it is over 200 per cent., while on others it is less than 50 per cent., thereby reducing the average to that percentage.

In addition, lessees under the unrestricted leases are required to make the payments when the machines are furnished, while under the restricted leases they are not required to make payments until the expiration of the leases and the return of the machines. The amounts required to be paid by such lessees amount to tens of thousands of dollars, and for some factories hundreds of thousands. The statement furnished the court by counsel for defendants shows that the initial payments for a complete group of machines necessary to operate a factory amount to $9,810 for every 1,000 pairs of shoes to be made daily. Many factories manufacture over 10,000 pairs daily. The Plant Shoe Company has in one factory a capacity of 12,000 pairs daily; another, the International Shoe Company, of 52,000 pairs daily, which would require over a half million dollars as initial payments. From this it will be readily seen that to lease all the machines on the initial payment or unrestricted plan would require an outlay which is practically prohibitive, and of course no manufacturer ever chooses the unrestricted leases.

The choice is limited to paying, not only royalties of which, under the restricted leases, the lessee is to some extent relieved, but large sums as initial payments. The loss of the use of the money required for the initial payments for a period of 17 years, the life of the leases, is an item of no small consideration, as the interest would exceed by far the principal, if calculated at 6 per cent. annually compounded. This cannot be termed "freedom of choice." United States v. Colgate & Co., 250 U. S. 300, 39 Sup. Ct. 465, 63 L. Ed. 992, relied on by the defendants is clearly inapplicable to this case. See United States v. A. Schrader's Son (opinion filed March 1, 1920) 251 U. S. 85, 40 Sup. Ct. 251, 64 L. Ed. ——.

### VII. Wholesale and Group Rates.

[15] It is claimed that the lower rates offered to manufacturers, who lease all machines used by them from the defendants, and the discounts allowed to them, are wholesale rates, permissible by section 2 of the Clayton Act (Comp. St. § 8835b). If it be assumed that section 2 applies to section 3, which latter is the only section in controversy in this action, this claim would still be untenable. There are no wholesale or retail transactions. Each department, it is claimed by the defendants, is separate and distinct from the others. But, even if this claim were true, although denied by the plaintiff, still the provision in the leases set out in Exhibit 8 to the complaint:

"But if any breach or default shall be made in the observance of any one or more of the conditions herein contained, *or contained in any other lease or license agreement,* * * * the lessor shall have the right by notice in

writing to the lessee *to terminate forthwith any and all leases or licenses * * * then in force between the lessor and lessee"

—applies to all leased machines, and not only to those in one department.

[16] In the opinion of the court, section 2 of the act is limited to sales, and not leases, and therefore does not apply to any of the acts prohibited by section 3.

But it is claimed that it is an economic advantage to shoe manufacturers to operate defendants' machines in teams. The preponderance of the evidence tends to support this contention. But if manufacturers are convinced that this is true, they will lease them in teams or groups without the restrictions in the leases. On the other hand, if any of them believe that they can manufacture more economically and obtain the same or better results at less expense by the use of competitors' machines, although mistakenly, these negative covenants, with the penalties attached, tend to deprive them of freedom of choice, based on their own judgment. It is hardly to be supposed that shoe manufacturers are less anxious to use the best and most economical machines than other manufacturers, or that they will use machines which will result in inferior products and less profitable results. Quoting from the opinion of Mr. Justice McKenna in the former case, referring to patents (247 U. S. 65, 38 Sup. Ct. 485, 62 L. Ed. 968):

"If the world buy it or use it, the world will do so upon a voluntary judgment of its utility, demonstrated, it may be, at great cost to the patentee. If its price is too high, whether in dollars or conditions, the world will refuse it; if it be worth the price, whether of dollars or conditions, the world will seek it."

To enable manufacturers to use their own judgment, and exercise their choice based on that judgment, was beyond doubt one reason for the enactment of section 3 of the Clayton Act.

## VIII. Clauses Never Enforced.

[17] That no leases of machines have ever been declared forfeited by defendants for a breach of any of these clauses is not conclusive that they never will be. If it is not intended to enforce them, why insert them? The fact that they are inserted places it in their power, whenever they see proper to do so, and that fact is sufficient to deter lessees from violating them, as is fully established by the evidence. Although the forfeiture clauses have never been enforced, except in some few instances, and then for good cause, lessees, who have violated them, have had their attention called to these provisions in the leases, which in itself was in the nature of a threat to enforce them, if the violations are continued; at least, it was so understood by them. Some have been penalized by the refusal of the defendants to lease them additional machines, except on the initial payment plan. Full royalties have been exacted for shoes made in part on machines other than those leased from defendants, as if wholly made on their leased machines. Witherell & Dobbins Co. v. United Shoe Machinery Co., supra, was an action to recover such royalties. The evidence also shows a number of other instances of such demands by defendants.

For these reasons this claim cannot be sustained in an action under the Clayton Act, although in a proceeding under the Sherman Act the conclusion may be otherwise.

## IX. Leases Since the Clayton Act.

[18] The leases required to be executed since the enactment of the Clayton Act do not contain the tying clauses complained of, but they are only "temporary leases," as is printed in large letters at the top of every lease made by the defendants since then. These leases contain the following clause:

"At any time prior to the redelivery by the licensee to the United Company as hereinafter provided of all of said machinery, the United Company may present to the licensee a lease and license agreement setting forth the terms and conditions upon which the United Company is willing that the said machinery may continue to be held and used by the licensee, and within a period of ten (10) days after such presentation the licensee shall either (a) execute such agreement in duplicate, and deliver the same to the United Company, making such payment, if any, as may be provided by such new agreement to be made upon the execution thereof, or (b) within said period of ten (10) days, pay to the United Company in respect to each machine the amount set opposite the name thereof in said column II, and within twenty (20) days thereafter surrender and redeliver the said machines to the United Company as hereinafter provided, whereupon the lease thereof shall terminate."

In addition to this provision in the leases, lessees are required to enter into an "additional agreement," which, after reciting the pendency of this action, contains the following provision:

"Now, therefore, in addition to and independently of all agreements and obligations set forth in said order and temporary loan agreement, the licensee hereby agrees that, in case his said order shall be accepted and the machines referred to in said order and temporary agreement be supplied to the licensee, the United Company shall have the right at any time or times thereafter to present to the licensee a new or additional agreement or agreements for execution by the licensee, establishing the terms and conditions upon which said machines shall thereafter be held, used and paid for by him, and containing such provisions, in substitution for and in addition to those set forth in the attached order and temporary loan agreement, as the United Company may decide upon as necessary or desirable, for the proper protection of its property, interests, and rights, and the assurance to it of a proper return of the use of its property during the further continuance of the use thereof by the licensees; and, if not, when such new and additional agreement or agreements are presented, the licensee agrees that within five days after the presentation thereof he will either execute the same (in which case the machinery referred to in the order and temporary loan agreement hereto attached shall thereafter be held by the licensee in accordance with the terms of said new agreement or agreements), or if he does not so execute will within said period of five days exercise his right as provided in article 13 of said order and temporary loan agreement to terminate the same on 30 days' notice, and will return the machinery therein named within said 30 days, all as provided in said article 13, and in such case failure so to exercise his right of terminating said order and temporary loan agreement, or to return the machines therein referred to, shall constitute a default for which, under the provisions of article 14 of said order and temporary loan agreement, the United Company shall be entitled to exercise its right of terminating the same as therein provided."

This establishes beyond question that these leases are intended for temporary use, to avoid the prohibitions of section 3 of the Clayton Act, pending the litigation affecting their legality. But, should the con-

tention of the defendants be sustained that these conditions are not unlawful, the right reserved would no doubt be promptly exercised, and new leases containing these clauses demanded; at least, the power to do so is reserved. To prevent this a court of equity is justified in extending its protecting arm, so far as, in its opinion, any of the clauses are unlawful under this statute.

## X. Invalidity of Clauses.

[19] The clauses set out in Exhibits 2 and 7 to the complaint are not obnoxious, for reasons stated in the former opinion. 234 Fed. 127.

[20] Exhibit 4 contains two distinct covenants. The first is:

"The lessee shall obtain from the lessor exclusively, and shall pay therefor at the regular prices from time to time established by the lessor, all duplicate parts, extras, mechanisms, and devices of every kind needed or used in operating, repairing, or renewing the leased machinery, and the same shall form part of the leased machinery, and the lessee shall not otherwise make or allow to be made any addition, subtraction, or alteration to, from, or in the leased machinery without the consent in writing of the lessor, nor interfere with the proper operation of the same."

In the opinion of the court there is nothing unreasonable in this provision. The evidence shows that most, if not all, parts of these machines, are very delicate, and unless perfectly adjusted will, if not entirely, at least very seriously, prevent the proper operations of the machine, and in some instances prove ruinous, necessitating costly repairs, thus depriving the lessee of a full output, and the lessor of royalties. They may also cause dissatisfaction with the machines, owing to the decreased and unsatisfactory output. The parts furnished by the defendants are all standardized and fit perfectly, so that by replacing broken or worn-out parts with the parts made by defendants, the machines will perform the work in as satisfactory manner as a new machine. As testified by a witness:

"Many of the machines are necessarily of a very complicated nature. Many of them have very many moving parts, which must be so made, arranged, correlated, and adjusted that they will not interfere with each other in the operation of the machine. Many of the machines operate at very high speed, so that the size of the parts and the adjustments must be accurate to the finest degree. The parts must be made of proper materials, with proper attention to temper, hardness, wearing qualities, as well as made with the utmost accuracy as to fit. The parts, when placed in the machine, become constituent parts of the machine itself, which is the United Company's own property."

The evidence also establishes that all repairs of leased machines are made by the defendants' skilled mechanics, which, of course, would only be done if the parts to be replaced are purchased from them.

[21] The second part of this clause is:

"The lessee shall also purchase from the lessor exclusively, at the prices from time to time established by the lessor, all supplies, including string nail, tack strips, and other fastening material used in connection with the leased machinery."

This part is objectionable as tending to substantially lessen competition and create a monopoly in these articles. It is true the evidence establishes that the prices charged for them by defendants are reason-

able; that they have not been advanced in years, not even since the outbreak of the European War, although the prices of similar articles, manufactured by competitors, have been advanced materially since then; and that at the present time the defendants offer them at lower prices than any of their competitors in that line. But by this part of the clause they reserve the right to raise the prices at any time, and the lessees would be compelled by the terms of the leases to purchase them from the defendants "at the prices from time to time established by the lessor." This places it in the power of the lessor to substantially lessen competition in these lines of trade, and therefore is obnoxious to the statute. As said in Patterson v. United States, 222 Fed. 599, 620, 138 C. C. A. 123, 144:

"But, though but one competitor can make a sale, all competitors can enjoy the free opportunity of approaching each and every prospective purchaser on equal terms, with the chance of making a sale, if he can persuade him to buy. For one competitor to exclude all, or substantially all, other competitors from such opportunity—i. e., drive them from the field of freely offering their goods, so as to have that field to himself—is to monopolize, according to the legal and accurate sense of the word."

This also applies to the condition in Exhibit 12.

[22] The clause set out in Exhibit 8, so far as it relates to the 17-year term of the leases, is not prohibited by the statute, nor is there any reason for the courts to interfere with the freedom of contract by the parties, in the absence of a statute forbidding it, assuming that the Legislature has that power, which it is unnecessary to determine in this action.

[23] Aside from this, the leases contain a provision that—

"The *lessee* or lessor may terminate the contract at any time upon 60 days' notice to the other party."

The part of this clause which gives the lessor the right to terminate the lease for the breach of any of the conditions contained in the lease is also proper, provided the conditions found by the court to be unlawful are eliminated. There is no reason why a lessor may not stipulate for the forfeiture of a lease for a breach of lawful conditions. There are few leases made which do not contain such a provision. As the decree in this cause will enjoin the enforcement of the provisions found to be unlawful, and also from inserting them in new leases, this clause will be unobjectionable. The other provisions in that exhibit, relating to forfeitures of leases, are clearly in violation of the statute.

[24] The provisions in Exhibit 10 are unobjectionable, except the proviso, which is in the nature of a rebate. This proviso and the last clause, beginning with the words, "In respect to all footwear," should be eliminated, as being objectionable to that part of section 3 of the act which makes unlawful to allow—

"a discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller." Commonwealth v. Strauss, 191 Mass. 545, 78 N. E. 136, 11 L. R. A. (N. S.) 968, 6 Ann. Cas. 842.

The part of the clause set out in Exhibit 9 to the complaint, which states the schedule of payments for shoes welted *"in whole or in part,* or the soles of which shall have been *in whole or in part* attached to welts by the use of *any* welting or stitching or sewing machinery * * * in respect to each pair of 'turned' boots, shoes, or other footwear, or portions thereof, manufactured or prepared by or for the lessee, the soles of which shall have been sewed or attached to their uppers *in whole or in part* by the use of *any* sewing or stitching machinery," can only be sustained after striking out the words "in whole or in part" and the word "any," wherever they occur in this clause, as in the opinion of the court they are in violation of the statute.

Counsel for defendants claimed that the object of these provisions is to enable them to collect from the lessors all the royalties to which they are entitled, and without them dishonest lessees may defraud them by claiming that other machines were used for part of the manufacture. But unlawful conditions may not be imposed to prevent probable unlawful or fraudulent acts. The law is ample to protect parties against them, without resorting to unlawful means.

That part of the clause set out in Exhibit 11 to the complaint, which requires the payments set out in the schedule of payments, "whether performed by the machinery of the United Company or by other machines," is unlawful, and should be eliminated.

This also applies to the rebate provided in that exhibit as an exception.

[25] The conditions set out in Exhibits 1, 3, 5, and 6 are all in violation of the statute, and therefore should be enjoined.

## XI. Is Section 3 of the Clayton Act to be Given a Retrospective Construction, so as to Effect Leases and Contracts Entered into Before Its Enactment?

[26, 27] That Congress may enact a statute having a retrospective effect is undoubted, but the question is, has it done so? The general rule is well established that a legislative act will not be construed as retroactive or retrospective, unless the language clearly shows that this was the intention of the lawmakers, and that no other construction will make the act effective. United States v. Heth, 7 U. S. (3 Cranch) 399, 413, 2 L. Ed. 479; Twenty Per Cent. Cases, 87 U. S. (20 Wall.) 179, 187, 22 L. Ed. 339; Chew Heong v. United States, 112 U. S. 536, 559, 5 Sup. Ct. 255, 28 L. Ed. 770; United States v. Burr, 159 U. S. 78, 15 Sup. Ct. 1002, 40 L. Ed. 82; United States v. American Sugar Co., 202 U. S. 563, 573, 26 Sup. Ct. 717, 50 L. Ed. 1149; Union Pacific R. R. v. Laramie Stock Yards, 231 U. S. 190, 199, 34 Sup. Ct. 101, 58 L. Ed. 179; Holt v. Henley, 232 U. S. 637, 34 Sup. Ct. 459, 58 L. Ed. 767; Waugh v. Mississippi University, 237 U. S. 589, 595, 35 Sup. Ct. 720, 59 L. Ed. 1131. In the Heth Case the court said:

"Words in a statute ought not to have a retrospective operation, unless they are so clear, strong, and imperative that no other meaning can be annexed to them, or unless the intention of the Legislature cannot otherwise be satisfied."

This is quoted and followed in Chew Heong v. United States, su-pra; the court adding:

"And such is the settled doctrine of this court."

Even if an act is remedial, the same rule of construction will be adopted, although such acts are always liberally construed. Winfree v. Northern Pacific Ry., 173 Fed. 65, 97 C. C. A. 392, 44 L. R. A. (N. S.) 841, affirmed 227 U. S. 296, 301, 33 Sup. Ct. 273, 57 L. Ed. 518. If the statute, by giving it a retrospective construction, will deprive one of a contractual right or interfere with antecedent rights, this rule of strict construction will never be departed from. Twenty Per Cent. Cases, supra; Chew Heong v. United States, 112 U. S. 536, 559, 5 Sup. Ct. 255, 28 L. Ed. 770; City Railway v. Citizens' Street R. R., 166 U. S. 557, 565, 17 Sup. Ct. 653, 41 L. Ed. 1114; Knights Templar Indemnity Co. v. Jarman, 187 U. S. 197, 205, 23 Sup. Ct. 108, 47 L. Ed. 139; Union Pacific R. R. v. Laramie Stockyards, 231 U. S. 190, 199, 34 Sup. Ct. 101, 58 L. Ed. 179; Atoka Coal Mining Co. v. Adams, 104 Fed. 471, 473, 43 C. C. A. 651. The reasoning of the court in this case was adopted in Southwestern Coal Co. v. McBride, 185 U. S. 499, 503, 22 Sup. Ct. 763, 46 L. Ed. 1010, and Jaedicke v. United States, 85 Fed. 372, 375, 29 C. C. A. 199.

[23] Does the language of section 3 of the Clayton Act require a retroactive construction under these well-established rules of law? Four national courts of high standing, one of them a Circuit Court of Appeals, have held that this section should be given the retrospective construction claimed on behalf of the government. Elliott Machine Co. v. Center (D. C.) 227 Fed. 124, decided by Judge Sessions. It was so construed by Judge Dyer in the instant case, when the application for a temporary injunction was heard by him. 227 Fed. 507. In Motion Pictures Patent Co. v. Universal Film Mfg. Co. the same conclusion was reached at nisi prius, and this ruling was expressly affirmed by the Circuit Court of Appeals for the Second Circuit. 235 Fed. 398, 148 C. C. A. 660. This case was affirmed by the Supreme Court, without passing upon this question, or the effect of the Clayton Act (243 U. S. 502, 37 Sup. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959), the court saying:

"Our conclusion renders it unnecessary to make the application of the statute [referring to the Clayton Act] to the case at bar which the Circuit Court of Appeals made of it, but it must be accepted by us as a most persuasive expression of the public policy of our country with respect to the question before us."

In Elliott Machine Co. v. Center it was unnecessary to pass on that question, and what is there said may well be treated as obiter, and but for the other authorities cited would be so treated. The court bases this conclusion on the fact that the motion of defendants to dismiss was denied on the ground that to sustain it would result in injustice to the plaintiff, regardless of the provisions in section 3 of the Clayton Act, and it was unnecessary to determine the effect of the Clayton Act.

The authorities relied on by the learned judges in all these cases are Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681; Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, and kindred cases arising under the Interstate Commerce Act; Philadelphia, etc., R. R. v. Schubert, 224 U. S. 603, 32 Sup. Ct. 589, 56 L. Ed. 911, and others arising under the Employers' Liability Act; and Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, involving the Sherman Act. In the last-cited case no question of retrospective construction of the act was involved. The unlawful combinations charged by the government in that action were begun on December 28, 1894, more than four years after the passage of the Sherman Act. It is therefore inapplicable to this issue.

A comparison of the provisions of those acts with that now under consideration will show how materially the language in the Clayton Act differs from that employed in those acts. Section 5 of the Employers' Liability Act (Comp. St. § 8661), the section construed in the Schubert Case, declares:

"*Any* contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act, shall to that extent be void."

The Supreme Court, construing this provision of the act, held the language to be sufficiently comprehensive to nullify all such contracts, saying:

"But that the provisions of section 5 were intended to apply as well to existing as to future contracts and regulations of the described character cannot be doubted. The words, 'the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act,' do not refer simply to an actual intent of the parties to circumvent the statute. The 'purpose or intent' of the contracts and regulations, within the meaning of the section, is to be found in their necessary operation and effect in defeating the liability which the statute was designed to enforce. Only by such general application could the statute accomplish the object which it is plain that Congress had in view."

Section 3 of the Clayton Act does not declare "any contracts and leases [prohibited by that section] to be void," but that "it shall be unlawful for any person," etc., "to make such contracts," etc. Ordinarily the word "shall" indicates that the act is to be prospective, and not retrospective. In United States v. Burr, 159 U. S. 78, 87, 15 Sup. Ct. 1002, 1006 (40 L. Ed. 82), the court, in construing a tariff act, said:

"The language of section 1 was that on and after the 1st of August there *shall* be levied, and of the second section, that on and after the 1st day of August certain enumerated articles, when imported, *shall* be exempt from duty. In our judgment, the word 'shall' spoke for the future, and was not intended to apply to transactions *completed* when the act became a law."

In the Armour Packing Company Case Act March 2, 1889, c. 382 (25 Stat. 857) was under consideration. That act makes it unlawful "to charge, demand, collect, or receive * * * a greater or less com-

pensation," etc., "than is specified in the schedule filed" with the Interstate Commerce Commission, and then in force. The court said:

"There is no provision excepting special contracts from the operation of the law. One rate is to be charged, and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute. There is no provision for the filing of contracts with shippers, and no method of making them public defined in the statute. If the rates are subject to secret alteration by special agreement, then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper, nor carrier may depart."

In the Mottley Case the question before the court was whether a contract made by the railroad company and the Mottleys in 1871, in compromise of claims for damages for injuries sustained by them, while passengers on one of the railroad's trains, caused by its negligence whereby the railroad company obligated itself to issue annually free passes to them on its railroad and branches during the lives of either of them, was enforceable after the Hepburn Act of June 29, 1906 (chapter 3591, 34 Stat. 584, 586), became a law. The sections of the act construed were sections 1 and 2 (Comp. St. §§ 8563, 8569); the latter amending section 6 of the Interstate Commerce Act. The court, after referring to the original Interstate Commerce Act of 1887 (24 Stat. 379), said:

"But the act of June 29, 1906, made a material addition to the words of the act of 1887; for it expressly prohibited any carrier, unless otherwise provided, to demand, collect or receive 'a greater or less or different compensation' for the transportation of persons or property, or for any service in connection therewith, than the rates, fares, and charges specified in the tariff filed and in effect at the time. We cannot suppose that this change was without a distinct purpose on the part of Congress. The words 'or different,' looking at the context, cannot be regarded as superfluous or meaningless. We must have regard to all the words used by Congress, and as far as possible give effect to them. Washington Market Co. v. Hoffman, 101 U. S. 112, 115, 25 L. Ed. 782. The history of the acts relating to commerce shows that Congress, when introducing into the act of 1906 the word 'different,' had in mind the purpose of curing a defect in the law and of suppressing evil practices under it, by prohibiting the carrier from charging or receiving compensation, except as indicated in its published tariff. 11 Ann. Rep. Interstate Com. Com. 141; 19 Id. 78, 15; 40 Cong. Rec. pt. 7, p. 6608; Id. 6617; Id. 7428, 7434; Rept. of Confer. Com. 40 Cong. Rec. 9522; 42 Cong. Rec. pt. 2, p. 1746.

"In our opinion, after the passage of the Commerce Act, the railroad company could not lawfully accept from Mottley and wife any compensation 'different' in kind from that mentioned in its published schedule of rates. And it cannot be doubted that the rates or charges specified in such schedule were payable only in money. They could not be paid in any other way, without producing the utmost confusion and defeating the policy established by the acts regulating commerce. The evident purpose of Congress was to establish uniform rates for transportation, to give all the same opportunity to know what the rates were, as well as to have the equal benefit of them. To that end the carrier was required to print, post, and file its schedules, and to keep them open to public inspection. No change could be made in the rates embraced by the schedules, except upon notice to the Commission and to the public. But an examination of the schedules would be of no avail, and would not ordinarily be of any practical value, if the published rates could be disregarded in special or particular cases by the acceptance of property of various kinds, and of such value as the parties immediately concerned chose to put upon it, in place of money for the services performed by the carrier."

In disposing of the contention that the contract, being originally valid, is not affected by the act of 1906, the court said:

"It solved the question when, without making any exceptions of existing contracts, it forbade by broad, explicit words any carrier to charge, demand, collect, or receive a 'greater or *less or different* compensation,' for any services in connection with the transportation of passengers or property, than was specified in its published schedules of rates. The court cannot add an exception based on equitable grounds when Congress forbore to make such an exception. Yturbide v. United States, 22 How. 290, 293 [16 L. Ed. 342]. The words of the act, therefore, must be taken to mean that a carrier, engaged in interstate commerce, cannot charge, collect, or receive for transportation on its road anything but money."

Had Congress, when enacting the Clayton Act, intended to apply the prohibitions in section 3 to existing contracts, it would have used language similar to that found in the Hepburn Act of 1906 or the Employers' Liability Act (Comp. St. §§ 8657–8665).

In Peters v. Veasey, 251 U. S. 121, 40 Sup. Ct. 65, 64 L. Ed. —— (opinion filed December 8, 1919), the effect of the amendments of October 6, 1917 (chapter 97, 40 Stat. 395 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 991(3)]), to clause 3 of section 24 and clause 3 of section 256 of the Judicial Code (Comp. St. § 1233), was before the court. The facts in that case were:

In Southern Pacific Co. v. Jensen, 244 U. S. 205, 37 Sup. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900 (opinion filed May 21, 1917), it had been decided that one sustaining an injury while engaged in work, maritime in its nature, is not entitled to the benefits of the Workmen's Compensation Laws of the state where the injury was sustained. Almost immediately thereafter the bill to remedy this was introduced in Congress, to amend these sections of the Judicial Code by adding to each, after the words "saving to suitors, in all cases, the right of a common-law remedy where the common law is competent to give it," the words, "and to claimants the rights and remedies under the Workmen's Compensation Law of any state," and promptly enacted as a law. The intestate of the plaintiff had been employed by the defendants, as a longshoreman, on board of a ship at the port of New Orleans, in the state of Louisiana, and while engaged in that work, on August 6, 1915, accidentally fell through a hatchway; death resulting therefrom. At the time of his injury and death the Compensation Law of the state of Louisiana (Act No. 20 of 1914) was in force. The administratix of the deceased instituted an action in a court of that state, claiming compensation under that statute, and recovered a judgment, after the amendatory act of 1917 had become a law. This judgment was affirmed by the Supreme Court of Louisiana. 142 La. 1012, 77 South. 948. On error to that court the Supreme Court reversed this judgment. Mr. Justice McReynolds, who delivered the unanimous opinion of the court, said:

"The court below erroneously concluded that this act [Act Oct. 6, 1917] should be given retroactive effect and applied in the present controversy. There is nothing in the language employed, nor is there any circumstance known to us, which indicates a purpose to make the act applicable when the

cause of action arose before its passage, and we think it must not be so construed."

In Missouri, Kansas & Texas Ry. v. Sealy, 248 U. S. 363, 365, 39 Sup. Ct. 97, 63 L. Ed. 296, it was held that the Carmack Amendment to the Interstate Commerce Act (Comp. St. §§ 8604a, 8604aa) was not retroactive, and does not apply to causes of action which arose before the passage of that act.

If there is room for doubt as to the intention of Congress, it is removed by reference to the proceedings in Congress when the bill was pending in the Senate. Senator Lee moved to amend the section, which, in the bill as passed by the House of Representatives, was section 4, and in the act as finally passed is section 3, the section under consideration, by inserting, after the word "condition," the words "whether heretofore or hereafter made," so that the clause would read as follows:

"And any such conditions whether heretofore or hereafter made shall be null and void, as being in restraint of trade and contrary to public policy."

The amendment was defeated. Cong. Record, Aug. 26, 1914, pp. 15575, 15576. Senator White offered an amendment:

"And that any agreement embracing any such requirement or prohibition is hereby declared illegal."

This was also rejected. Cong. Record, Sept. 2, 1914, pp. 15959, 15961.

Nor were either of these amendments, or words of similar import, inserted in the bill, when reported from the conference committee of the two houses and as finally enacted.

[29] That the probative value of the rejection of an amendment will be considered by the courts in construing an act, if the language is at all doubtful, has been frequently decided. Lapina v. Williams, 232 U. S. 78, 89, 34 Sup. Ct. 196, 58 L. Ed. 515; Pennsylvania R. R. Co. v. International Coal Co., 230 U. S. 184, 198, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315; Carey v. Donohue, 240 U. S. 430, 437, 36 Sup. Ct. 386, 60 L. Ed. 726, L. R. A. 1917A, 295; United States v. St. Paul, etc., Ry. Co., 247 U. S. 310, 318, 38 Sup. Ct. 525, 62 L. Ed. 1130; McDonald & Johnson v. Southern Express Co. (C. C.) 134 Fed. 282, 288, and inferentially in Boyd v. Thayer, 143 U. S. 135, 167, 12 Sup. Ct. 375, 36 L. Ed. 103. In the Pennsylvania R. R. Co. Case the court said:

"The fact that this provision measuring the amount of recovery by rebate was omitted from the act, as finally reported to both houses and passed, is not only significant, but so conclusive against the contention of the plaintiff that it quotes, not the report of the conference committee, but a statement made by a member of the conference committee, to support the present argument that section 8 means the same thing as the omitted clause."

In Carey v. Donohue, the court, speaking of the effect of an amendment striking out a part, said:

"We cannot but regard the action of Congress as a deliberate refusal to conform the requirements of section 60 to those of section 3b, and we are not at liberty to supply by construction what Congress has clearly shown its intention to omit."

In United States v. St. Paul, etc., Ry. Co., the latest expression on that subject, it was said:

"It is not our purpose to relax the rule that debates in Congress are not appropriate, or even reliable, guides to the meaning of the language of an enactment. United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 318 [17 Sup. Ct. 540, 41 L. Ed. 1007]. But the reports of a committee, including the bill as introduced, changes made in the frame of the bill in the course of its passage, and statements made by the committee chairman in charge of it, stand upon a different footing, and may be resorted to under proper qualifications."

The conclusion of the court is that the act should not be given a retroactive construction, declaring these clauses in leases made before its enactment void.

[30] This result has not been reached without the most careful consideration of the opinions of the learned judges in the cases hereinbefore referred to. If this court were at all in doubt as to the construction of the act on this question, it would consider it its duty to follow the decisions of the learned judges in construing the act as retroactive, upon the ground that courts should always lean toward uniformity of decisions. But in the absence of a decision by a court, whose judgment is authoritative on the court trying the case, every judge must exercise his best judgment, and decide legal questions submitted to him in accordance with his own views, when, after a most careful consideration of the law, he reaches the conclusion that to follow such precedents would result in misconstruction of the law and a miscarriage of justice.

A decree in conformity with the views expressed may be prepared, and, if counsel are unable to agree on any provisions, the court will hear them and determine what the decree shall be.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes